CRAWFORD *v.* STATE

[No. 209, September Term, 1962.]

*Decided May 1, 1963.*

356

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Albert A. Levin* for the appellant.

*Joseph S. Kaufman, Special Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney for Baltimore City,* and *John Paul Rogers, Assistant State's Attorney,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The defendant-appellant, Crawford, was tried in the Criminal Court of Baltimore before the court, sitting without a jury, on a charge of murder, was convicted of manslaughter and was sentenced to eight years' imprisonment. His defense was that he was defending himself and his home against an attack by the decedent Bobbie Ferrell, who was seeking to force his way into the appellant's home to beat and rob him. He admitted having fired the fatal shot, but claimed that he intended only to shoot the intruder in the hand and that shooting him in the head was accidental. The trial judge believed at least most of the essentials of the defendant's statements, but found that he had used excessive force in resisting the intrusion and for that reason found him guilty of manslaughter. The defendant appeals.

The appellant was a forty-two year old man who had suffered from ulcers and nervous disorders, and was on relief for disability. He lived in a first floor front room at 16 North Pearl Street, in Baltimore, and for a week or two before the shooting had shared his quarters with a man named William Robinson. No one else lived in the building. There was a front outside door which opened into a vestibule, and there was an inner door between the vestibule and a long hallway. This inner door

could be secured by a spring lock, which seems to have been the only lock protecting the appellant's room. One of four panes of glass in the upper portion of this door had been broken and had been replaced by a piece of masonite nailed to the inside of the door. The appellant's room opened off the hallway just inside this inner door.

The deceased, Bobbie Ferrell, his brother Lee, and one Harold Austin (known as "Slim"), and probably others, had been in the habit of "hanging around" the appellant's room or the front of the house where he lived. Bobbie Ferrell, according to the death certificate, was twenty-three years old and the other two named above were near his age. The exact state of relations between these boys and the appellant, Crawford, is by no means clear. It seems that they had gone into Crawford's room pretty much whenever they pleased and that if they had ever been welcome, they no longer were so on March 12, 1962, the day when the shooting here involved occurred. On that very day Crawford had complained about them to the police and the police had visited his home at some time during the morning, but found none of the boys there at the time.

The appellant stated that Bobbie Ferrell and Austin had come to his room shortly after the police left, that Ferrell accused the appellant of being a "police snitcher", that Ferrell hit him in the face and charged him with trying to get Ferrell locked up for stealing, that Ferrell asked him for money and Ferrell and Austin left when the appellant said that he had none, but would have some later in the day.

That day the appellant was to receive his welfare check by mail. He stated that in order to keep it away from Ferrell and Austin, he went out on the street and met the postman about a block from his home, got his welfare check, cashed it at a nearby bar, and left $45.00 of the proceeds with a neighbor for safekeeping. He then met the police officers who had visited his home earlier that day and told them that the boys had come to his home and demanded money. They told him to call the police if the boys returned.

When he met the officers the appellant was on his way to a pawnshop. There he redeemed a shotgun which he had pawned about a year before, and he took it home "to keep it there to

scare them away." According to the appellant, Ferrell and Austin soon came back to his room and Ferrell picked up the shotgun from a bed, looked for shells, and said that if he found them he would use the gun. He did not find any; but again according to the appellant, Austin, with a knife in his hand, threw an arm around the appellant's neck, and Austin and Ferrell proceeded to rifle the appellant's pockets and took about $7.00 from him. The appellant's testimony is confirmed to some extent by Robinson, who was present at the time of this visit, but Robinson's testimony is somewhat confused. A third man, identified only by the name Thomas, was reportedly present at this second visit of Ferrell and Austin and later (at the time of the shooting), but he did not testify. Robinson confirmed the appellant's statements that Ferrell and Austin had visited the appellant's room before the appellant got his check and redeemed the gun. He also confirmed Crawford's statement that they returned after Crawford had cashed his check and brought back the gun and that they demanded money.

There are some differences between the appellant's testimony and Robinson's as to what was said at the time of Ferrell's and Austin's visits, and Robinson states (the appellant does not) that Lee Ferrell was also present. Robinson confirms the appellant's statements that Ferrell demanded money and said that they were coming back to get it, and he indicates that they knew that the appellant had received or was to receive his relief check that day. Robinson's testimony does not confirm (and Austin's testimony contradicts) the appellant's testimony that Ferrell and Austin robbed him at knife point. (Austin, at the time of Crawford's trial, was held on a charge of assault with intent to rob Crawford. We are not informed of the outcome of that case.) Robinson did, however, state that Ferrell's parting remark, after the appellant had told him and Austin to leave, was "We're going out, but you better damn sight have the money when we get back."

The appellant testified that Ferrell and Austin soon returned, Ferrell going to the front door and Austin to the rear door of the house. He said (partly in a statement made to the police shortly after his arrest, which was admitted in evidence without objection, and which he largely reaffirmed in his testimony)

that he called to Robinson and Thomas to get the police but that they and he would not go out of the house for fear that they would be "jumped" by Ferrell or Austin. He testified that Ferrell entered the vestibule and was trying to get through the inner door, which the appellant had locked with the spring lock after Ferrell and Austin had left. The appellant picked up his gun and loaded it and went into the front hall just inside this inner door. He could see Ferrell. Ferrell, finding the inner door locked, kicked at the bottom of it and said to appellant, "I'm coming in to kick your ass." Appellant, holding the door with his feet, warned Ferrell to stay out and told him that he had the gun, but (according to the appellant) Ferrell said he did not care about the gun. Ferrell then knocked loose the piece of masonite and reached inside to unlock the door, and as he did so, appellant backed away from the door and fired the gun killing Ferrell who was hit in the side of the face with the shotgun blast. The appellant said he backed away from the door because he "was scared" and Ferrell "was coming right in on me." He said he did not "aim for the head," that instead he fired at Ferrell's hand but the gun jerked up as he fired. He said that he did intend "for the gun to go off because the boys made me angry and I was scared they was coming in and hurt me."

Robinson confirmed most of the essentials of the appellant's account of what happened immediately before and just after the shooting. He said that he heard Crawford warn Ferrell not to come in and that if he did Crawford would shoot. Robinson made contradictory statements as to whether he had or had not heard anything said by Ferrell just before the shooting. His final testimony on this point was in accord with what he had said in a statement made to the police a few hours after the shooting (which was admitted by stipulation) that he heard Ferrell say: "I'm coming in here anyhow."

A police officer confirmed the appellant's statement that he had complained to the police earlier in the day about some boys bothering him in his home. He also confirmed the fact that the piece of masonite on the door had been knocked loose so that a man could get his hand in.

The trial court's comments at the end of the trial indicated

that he accepted and believed these material parts of appellant's story: (1) that Ferrell had been in the appellant's room demanding and taking money; (2) that Ferrell had warned that he would be back; (3) that at the time of the shooting Ferrell was unlawfully forcing or attempting to force his way into the appellant's home; (4) that the appellant did not deliberately fire at Ferrell's head. In addition, the court thought reasonable the appellant's explanation for not going outside to summon police help. But the court then found that "the defendant went further than the situation required," and entered a verdict of not guilty of murder but guilty of manslaughter.

We have not been referred to, nor have we found, any case decided by this court which is directly in point and controlling in the present case. Most American jurisdictions in which the question has been decided have taken the view that if an assault on a dwelling and an attempted forcible entry are made under circumstances which would create a reasonable apprehension that it is the design of the assailant *to commit a felony* or to inflict on the inhabitants injury which may result in loss of life or great bodily harm, and that the danger that the design will be carried into effect is imminent, a lawful occupant of the dwelling may prevent the entry even by the taking of the intruder's life. 1 *Warren on Homicide,* Sec. 162, pp. 805-6, citing authority from twenty-two American jurisdictions; Annotation, 25 A.L.R. 508, 509, citing authority from thirteen American jurisdictions; *People v. Osborne,* 278 Ill. 104, 115 N. E. 890 (rule stated, but not found applicable); *Carroll v. State,* 23 Ala. 28, 36 (rule stated, but not found applicable); *Parrish v. Commonwealth,* 81 Va. 1; *People v. Tomlins,* 213 N. Y. 240, 107 N. E. 496; and *Pond v. People,* 8 Mich. 150, a leading case in which the court said that a man assaulted in his dwelling "may use such means as are absolutely necessary to repel the assailant from his house, or *to prevent his forcible entry,* even to the taking of life." (Emphasis added). See also *Beard v. United States,* 158 U. S. 550, 559; *Alberty v. United States,* 162 U. S. 499.

In the Annotation in 25 A.L.R. above cited, it is stated at page 547 that:

"Where the property attacked is the home or habitation the rule limiting the use of force in its defense to such as will not endanger life or do great bodily harm does not apply, and it is generally held, on the theory that a man's house is his castle, that after a warning to desist he may use any and all such force as may be necessary to repel the intruders."

(Cf. *Maddran v. Mullendore,* 206 Md. 291, 300, 111 A. 2d 608, for a different rule applicable in a case involving interference with a right of way.)

There is also a generally accepted rule, which we think is correct, that a man faced with the danger of an attack upon his dwelling need not retreat from his home to escape the danger, but instead may stand his ground and, if necessary to repel the attack, may kill the attacker. *State v. Middleham,* 62 Iowa 150, 17 N. W. 446; *State v. Patterson,* 45 Vt. 308; *People v. Coughlin,* 67 Mich. 466, 35 N. W. 72; see also authorities cited above and Clark and Marshall, *Law of Crimes,* (6th ed. Wingersky rev.), sec. 7.03, pp. 436-7, where it is stated:

"* * * A man is not bound to retreat from his house. He may stand his ground there and kill any person who attempts to commit a felony therein, or who attempts to enter by force for the purpose of committing a felony, or of inflicting great bodily harm upon an inmate. In such a case the owner or any member of the family, or even a lodger in the house, may meet the intruder at the threshold, and prevent him from entering by any means rendered necessary by the exigency, even to the taking of his life, and the homicide will be justifiable."

It also seems appropriate to note at this point that one not seeking a fight may arm himself in anticipation of a violent attack. See *Gunther v. State,* 228 Md. 404, at 409, 179 A. 2d 880, and authorities there cited. Here we think that the appellant did have reason to anticipate such an attack.

Authorities elsewhere have recognized, correctly we think, that the rules regarding the defense of one's person and the

rules regarding the defense of one's habitation are generally similar. See *Beard v. United States, supra; State v. Patterson, supra; Mack v. State,* 97 Tex. Cr. 583, 263 S. W. 912; Annotation 34 A.L.R. 1488. We have had occasion in recent years to consider several cases involving the right to defend one's person and we think that the rules recognized in such cases, other than (as already noted) the duty to retreat, are generally applicable in cases where one is defending his own home against attack to prevent a felony or great bodily injury to an occupant. See *Nixon v. State,* 204 Md. 475, 105 A. 2d 243; *Guerriero v. State,* 213 Md. 545, 132 A. 2d 466; and *Bruce v. State,* 218 Md. 87, 145 A. 2d 428, each of which involved an assault or fight other than an attack on the habitation of the accused or his opponent. In the *Bruce* case we approved instructions relating to the law of self defense in the situation there presented pertaining to the duty to retreat, to use no more force than necessary to resist an attempted battery and to seek to avoid bloodshed, and stating that in order to establish that a homicide was justifiable because committed in self defense the defendant must show (1) that he was not the aggressor, (2) that he believed that he was in such immediate danger of losing his own life or suffering serious bodily harm that it was necessary to take the life of the deceased to save himself, and (3) that the circumstances would warrant reasonable grounds for such belief in the mind of a man of ordinary reason.

The most difficult problem in this case is whether the force used by the appellant in resisting the intrusion was excessive. The authorities generally seem to agree that the force used must not be excessive. In addition to the authorities already cited (particularly Clark and Marshall, *Law of Crimes,* Sec. 7.03), see 1 *Wharton's Criminal Law and Procedure* (Anderson Ed., 1957), § 206, at pp. 453-55, where it is stated in part:

"It is a justifiable homicide to kill to prevent the commission of a felony by force or surprise.

The crimes in prevention of which life may be taken are such and only such as are committed by forcible means, violence, and surprise, such as murder, robbery, burglary, rape, or arson.

\* \* \* \*

"It is also essential that killing is necessary to prevent the commission of the felony in question. If other methods could prevent its commission, a homicide is not justified; all other means of preventing the crime must first be exhausted."

A similar statement is made in *State v. Sorrentino,* 224 Pac. 420 (Wyo.), 34 A.L.R. 1477, at 1480: "But the right to kill is based upon the law of necessity or apparent necessity. \* \* \* The doctrine of the right to protect one's habitation gives no moral right to kill another, unless necessity or apparent necessity, for purposes countenanced by law, exists. \* \* \* A man has a right to prevent, in his home, the commission of a felony or the infliction on any of its inmates of a personal injury which may result in the loss of life or in great bodily harm."

The material parts of the defendant's statements which the trial court accepted as true, which we have set forth above, and his acceptance of the appellant's explanation as to why he did not seek help from the police at the time of the attack lead us to conclude that the trial court was clearly in error in finding that the appellant used excessive force. One conclusion which the trial judge did not state, but which we think is a proper and, indeed, inescapable one to be drawn from the testimony which he did believe, is that Ferrell's purpose in seeking to break into the appellant's residence was to beat him and rob him. Robbery is a felony.

The appellant was in his home, and as we have already held, was under no duty to retreat therefrom. We might add that retreat seemed impossible with Ferrell at one door and Austin at the other. He defended his home first by locking the door, by warning the deceased to stay out, then by holding the door against the deceased, and finally, when it became apparent that the deceased would be able to force his way in, by backing away from the door and firing his shotgun at the deceased's hand. The trial court believed appellant when he said he did not fire at the deceased's head, and believed that the appellant's statement that the gun jerked up when fired was reasonable. (With regard to the possible effect of this lack of intent to fire at the

head, see *Alberty v. United States, supra,* and *Beard v. United States, supra.*) We do not believe that the circumstances in this case show the use of unnecessary force by appellant, a man of 42 years of age with a history of illness and unable to work, in resisting the attack being actively made by a 23 year old man with the cooperation of a youthful partner, when these two had previously had no apparent difficulty in overcoming appellant. As this Court said in *Nixon v. State, supra,* 204 Md. 475, at 479-480, 105 A. 2d 243, as bearing on the question of justification to repel the assault by the use of a pistol, "the character and extent of the assault are important considerations * * *." Here important characteristics of the attack were that it was on the appellant's home and that its object was to beat and rob him. Under *Gunther v. State, supra,* 228 Md. at 411, the appellant had the burden of proving by a preponderance of the evidence that he acted reasonably in defense of his habitation against forcible entry. We think that he met this burden.

*Judgment reversed, without a new trial.*