DeVAUGHN *v.* STATE

[No. 22, September Term, 1963.]

448

*Decided October 10, 1963.*

*Motion for rehearing filed October 22, 1963, denied November 12, 1963.*

The cause was argued before the full Court.

*W. A. C. Hughes, Jr.,* for the appellant.

*Stuart H. Rome, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney for Baltimore City,* and *Charles E. Moylan, Jr., Deputy State's Attorney,* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

The appellant, Edward Everett DeVaughn, was tried before Judge Carter, sitting without a jury, in the Criminal Court of Baltimore, on a charge of murder of Robert Crawford. After a verdict of guilty of murder in the first degree without capital punishment, and a sentence of life imprisonment in the Maryland Penitentiary, he has taken this appeal.

He has raised three questions which will be dealt with separately, although not in the order in which counsel presented them in the briefs and oral argument.

There is considerable conflict in the testimony, and since several of the disputed facts go to the essence of the legal questions raised, it is necessary to set forth in some detail the circumstances and events surrounding the shooting of the deceased by the appellant at 121 Welcome Alley, the home of Carrie Lee Crump, on January 20, 1962.

The house in which she lived was extremely small. The downstairs consisted of a parlor upon entering the front door, and behind that a kitchen, with a back door. DeVaughn paid the rent, supported Carrie Lee, and lived in a so called common-law relationship with her.

The deceased, Robert Crawford, also known as Robert C. Waring, lived at 537 South Hanover Street, with Ruth Hayes, Carrie Lee's sister, and Harry Johnson. Ruth and Johnson were also living in a like relationship.

On the morning of January 20 the appellant left 121 and proceeded to 113 Welcome Alley to cut wood for an aged aunt, who lived there. Ruth and Johnson, followed later by Crawford, went to Carrie Lee's house, where there was a transaction involving the resale of a record player by Ruth to Carrie Lee. Meanwhile, DeVaughn returned from his chore and soon, at the suggestion of one of the group, all but Carrie Lee sat down at the kitchen table to play a card game called "pitty-pat", with a twenty-five cent ante. As they settled down, both DeVaughn and Crawford placed knives on the table, the latter commenting, "There will be no cheating here." The description of Crawford's knife varies with the witnesses. The length was variously estimated from two up to ten inches, and its character from that of a pen knife to a dirk.

After the game had progressed for some time, Crawford placed a quarter on the table and excused himself to go to the bathroom upstairs, saying, "I'll be right back. I don't want nobody to bother my hand." Carrie Lee played his hand and won. Upon his return he demanded the money. Carrie Lee returned the quarter, but insisted that the winnings belonged to her,

since she played the hand. Crawford became angry. While the State denied that Crawford threatened to harm Carrie Lee, the appellant claimed Crawford threatened to "kick her teeth out." Undisputed was Carrie Lee's assertion of self-protection by announcing she would blind Crawford with a can of lye. (She was no novice at this, having on a prior occasion received a sentence of thirty days in jail for throwing lye.) At this juncture, appellant intervened to protect his mistress. Both principal actors in the drama, DeVaughn and Crawford, brandished knives. They were dissuaded from attacking each other by Ruth and, shortly thereafter, both men left the house, separately. On his way out the appellant told Carrie Lee, "I am going home but I'll be back."

After an intermission of approximately eighteen minutes, Crawford returned and rejoined the card game, taking a seat at that end of the kitchen table nearer the back door. The appellant returned in due course, through the front door, bringing along with him Thad Hayes, father of Carrie Lee and Ruth. Exactly what happened to revive the argument and tension between the men was disputed. According to Ruth Hayes, a witness for the State, Carrie Lee told DeVaughn that Crawford was "smart" and further directed, "You shoot him.", and she further maintained that Crawford stood still by the table near the refrigerator. Appellant stated unequivocally that Crawford resumed the argument and advanced on him with a knife. The distance between the men, separated by the table, was variously estimated by the witnesses as being between six and fifteen feet.

After a brief exchange of profanities, appellant drew a twenty-two caliber pistol and fired at Crawford. The bullet hit him in the abdomen. The shot had the effect of clearing the room of all witnesses, except Ruth. Appellant insisted that Crawford continued to advance with the open knife, while the State's witness, Ruth, insisted Crawford slumped to his knees, whereupon appellant walked around the kitchen table, which had separated the antagonists, and while standing over the crumpled, but conscious, Crawford, fired a second shot which lodged in his inner left calf. The knife was found by Ruth near the refrigerator where Crawford had been standing. Ruth and John-

son (the latter having returned to the scene), took Crawford to the South Baltimore General Hospital.

On the day after the shooting the appellant was located by cruising patrolmen in the vicinity of Hill and Sharp Streets. Upon seeing the police car, DeVaughn fled, throwing his revolver into a trash can. The officers apprehended him immediately thereafter. They also located the gun. It contained three unspent cartridges, but the empty shells of those the appellant had fired could not be found.

The scene now shifts to the hospital where Crawford had been admitted at 1:30 p.m., on January 20, 1962. He was bleeding profusely and an operation was immediately performed. The abdominal operation, an exploratory laparotomy (an incision into the abdominal cavity through the flank), disclosed two holes in the sigmoid colon and one in the ileum, all three of which the surgeons closed. One bullet was located in the cecum but could not be removed. However, the bullet lodged in the left leg was removed without incident.

During the ensuing week Crawford appeared to be recovering satisfactorily. However, he contracted peritonitis, and with it his condition began to decline. On February 10 the incision in the abdominal wall burst open, disclosing an internal infection. The following day he was again operated on and the surgeons released numerous adhesions, drained an abscess, excised about two feet of small intestine, and performed a double ileostomy. Following this second operation Crawford remained in poor condition. An electrocardiogram disclosed a diseased heart in the nature of a coronary thrombosis. On February 13, approximately three weeks after the shooting, Crawford died. Two days later, appellant voluntarily gave a statement to the police and was thereafter indicted for murder.

Other facts necessary to the decision of the case will be set out hereafter.

Inasmuch as the instant case was tried by the court below sitting without a jury this Court may "review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Maryland

Rule 886 a. It is not the function of this Court to determine whether the appellant was guilty beyond a reasonable doubt, but merely to determine from the evidence and the proper inferences therefrom whether there was sufficient evidence to warrant the trial judge reaching the conclusion that the appellant was guilty beyond a reasonable doubt. *Basoff v. State,* 208 Md. 643, 653, 119 A. 2d 917.

## I

Did the trial court properly apply the law of self-defense?

The law on the subject of self-defense was fully set forth by this Court in the comparatively recent case of *Bruce v. State,* 218 Md. 87, 96-97, 145 A. 2d 428 (1958), where we said in approving the trial court's instructions to the jury:

> "[I]n order to justify or excuse the killing of another on the ground of self-defense, it was necessary to establish that the defendant was not the aggressor and did not provoke the conflict; that the defendant believed at the time he was in such immediate danger of losing his own life or suffering serious bodily harm as made it necessary to take the life of the deceased to save himself; that the circumstances were such as to warrant reasonable grounds for such belief in the mind of a man of ordinary reason; that, if the peril of the defendant was imminent, he did not have to retreat but had a right to stand his ground and to defend and protect himself; that an attempted battery may be met by resisting force with force provided no unnecessary violence was used and proper measures were taken to avoid the conflict and escape from shedding blood; and that it was the duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety."

Appellant contends that the trial court misapplied the law of self-defense applicable to one's habitation and person. The short answer to this point concerning habitation is that Judge Carter, as he fairly could have, found as a fact that the house in which the shooting occurred was not DeVaughn's home or

"castle." There was evidence that he lived with Carrie Lee, but DeVaughn himself, in his voluntary statement given to the police and admitted into evidence, gave as one address 912 Leadenhall Street. Also in the statement he said that when he was at 121 Welcome Alley he told his twin sons to "go home." As stated above, when the appellant himself left Carrie Lee's he said he was going home and would be back. This clearly indicated that he resided elsewhere.

But, even assuming that 121 Welcome Alley was DeVaughn's home, there was no reversible error. As we recently stated in *Crawford v. State*, 231 Md. 354, 190 A. 2d 538 (1963), the distinction that is made between defense of the home and defense of the person is merely that in the former there is no duty to retreat. In the instant case, a reading of the opinion of the trial court shows that the judgment rested solely upon a finding that DeVaughn used *excessive* force in resisting the deceased. And, unlike the *Crawford* case, there was ample evidence to support this finding.

The testimony shows that there were at least six feet (some estimations were as much as fifteen feet) and a table separating the two men when the first shot was fired. Appellant with a pistol clearly held a defensive superiority over Crawford, who had only a knife.

In addition to this was the fact that Judge Carter found the deceased not to have been an intruder. Earlier in the afternoon, it is true, Crawford had been asked to leave and did so, but there was no objection raised upon his subsequent return. Thus, what we said in *Crawford*, supra, at page 360, with respect to an intruder has no application here.

We conclude that the court below correctly applied the law of self-defense in this case.

## II

Was there an independent supervening cause of death?

This precise question appears to be a novel one in Maryland. While it was not entirely clear from his brief and oral argument, appellant seems to claim that Crawford's death was independently caused either (a) by negligent treatment while a hospital patient, or (b) by some infection or disease unrelated to the gunshot wound. The claim rests principally on the fact

that a week after the first operation, he was "up and about" and that on January 29 every third stitch was removed, indicating a satisfactory recovery. When Crawford's condition declined, a second operation, described as an "exploratory laparotomy" was performed. This the appellant labels a pointless fishing expedition, but that he misconstrues it is, we think, borne out by the facts. The operation was exploratory only in the sense the surgeons did not know beforehand the exact area of the source of infection. They were convinced, however, that adhesions had produced a partial obstruction of the small bowel and that this condition had to be remedied.

There was simply no evidence of improper medical treatment. But even if there had been, still we think appellant was not legally excused. The generally accepted principle governing this is stated in 1 Wharton, *Criminal Law and Procedure* (1957 ed.), § 201, pp. 449-450, to be:

> "The wrongdoer is not excused if the victim dies because he was careless in treating or neglected treating his wound, or the attending physician was negligent, unskilled, or made a mistake. The rule is founded upon the general principle that every person is to be held to contemplate, and to be responsible for, the natural consequences of his own acts. It may be said that neglect of the wound or its unskillful and improper treatment, which are of themselves consequences of the criminal act which might naturally follow in any case, must in law be deemed to have been among those consequences which were in contemplation of the guilty party, and for which he is to be held responsible."

Hochheimer, cited by appellant in his brief, states that the person who inflicted the injury is deemed to have caused the death, notwithstanding subsequent medical or surgical treatment, unless the death results *solely* from the effects of improper treatment. Hochheimer, *Criminal Law and Procedure* (2d ed.), § 339, p. 372.

Jurisdictions which have considered the question are overwhelmingly in accord. Cases are collected in an annotation in 8 A.L.R. 506, 516, supplemented by 39 A.L.R. 1268, 1270,

and 126 A.L.R. 912, 916. In the area of civil liability we have had occasion to recognize the principle that the first tort-feasor is liable for the additional damage caused by the acts of a negligent doctor. *Trieschman v. Eaton,* 224 Md. 111, 114, 166 A. 2d 892 (1961).

If, on the other hand, appellant meant that the peritonitis or coronary thrombosis which developed was the independent cause of death, the undisputed medical evidence clearly shows the contrary. It was the opinion of both the treating physician and those who conducted the autopsy, that Crawford would not have developed peritonitis nor would he have sustained a coronary thrombosis but for the gunshot wound and the poor physical condition which naturally followed. The fact that Crawford died from the combined effects of the wound *and* a disease unconnected therewith does not relieve appellant of responsibility. *Wharton, op. cit. supra,* §§ 201, pp. 450-451. *Quillen v. State,* 49 Del. 114, 110 A. 2d 445 (1955); *Weaver v. State,* 200 Ga. 598, 37 S. E. 2d 802 (1946). We think the trial judge was correct in his determination that the decedent's death was a direct result of the gunshot wound and that the appellant was not relieved of legal responsibility by any independent supervening cause.

*III*

Was the evidence legally sufficient to support the verdict?

It is true that there were material variations in the testimony, particularly that of Ruth Hayes and Carrie Lee Crump, both of whom the record shows had prior criminal convictions. The court found Ruth's testimony the more credible, and, mindful of the fact that we must give due regard to the opportunity of the lower court to judge the credibility of the witnesses, Maryland Rule 886 a, we can not say that the judge's conclusion was clearly erroneous.

While appellant's brief does not squarely challenge the State's evidence adduced to convict of first degree murder, it was urged upon this Court in oral argument that the conviction should have been no greater than that of manslaughter. Where the law, as in Maryland, divides murder into grades, there is a presumption that the homicide is murder in the second degree and the State must prove that the killing was wilful, deliberate and pre-

meditated to obtain a conviction of murder in the first degree. *Chisley v. State*, 202 Md. 87, 95 A. 2d 577 (1953).

By the same token, where, as in the instant case, a defendant claims justification of the homicide by virtue of self-defense, it is he who has the burden of proving this affirmative defense. *Gunther v. State,* 228 Md. 404, 410, 179 A. 2d 880 (1962). As we pointed out in I above, the trial judge was justified in finding as a fact that the appellant used excessive force in repelling Crawford's potential attack.

In *Chisley, supra,* at page 106, Judge Hammond for this Court cites with approval Hochheimer's definition of *wilful* as "a specific purpose and design to kill," *deliberate* as "full and conscious knowledge of the purpose to do so," and, *premeditated* as meaning "the design must have preceded the killing by an appreciable length of time, time enough to be deliberate." Hochheimer, *op. cit. supra,* § 347, p. 380.

Judge Carter reasoned that since the earlier argument between DeVaughn and Crawford failed to produce the pistol, the logical inference was that the appellant, when he went home, got the pistol. We think this was a permissible inference. Additional facts that DeVaughn walked around the table which separated him from Crawford and fired the second shot while standing over him, we think justified the judge's finding that the homicide was wilful, deliberate and premeditated.

For the reasons above stated the judgment below must be affirmed.

*Judgment affirmed.*