765 A.2d 645

**STATE of Maryland**

v.

**Nathaniel Damian MARR.**

**No. 47, Sept. Term, 2000.**

Court of Appeals of Maryland.

Jan. 16, 2001.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for petitioner.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

WILNER, Judge.

Respondent, Nathaniel Marr, was convicted in the Circuit Court for Prince George's County of the first degree premeditated murder of Arthur Carroll, the first degree assault of Jimmy Abass, and two counts of the use of a handgun in the commission of a crime of violence, for which he was given substantial consecutive sentences. The killing and the assault occurred on the evening of December 2, 1998, when Marr and a confederate, Curtis Alston, approached the rear of a waiting taxicab and opened fire on Carroll, who was about to enter the cab. Carroll was killed and Abass, the driver of the cab, was wounded.

That Marr shot Carroll and Abass was never in dispute. Abass, by all accounts, was an innocent bystander who was simply in the wrong place at the wrong time. The shooting of Carroll stemmed from an incident that occurred three days earlier, on November 29, when Carroll, Kevin Jackson, and Jerome Wright went to Marr's home with the intent to rob him. Marr was not at home, but the three came upon Marr's cousin, Ronald Muse, with whom Marr lived. In the course of searching for drugs and money, one or more of the trio shot and killed Muse. Marr later went looking for Carroll and Jackson, allegedly to inquire about their involvement in the killing of Muse. On December 2, he caught up with Carroll; on December 4, he found Jackson, who was luckier than Carroll and managed to escape in a hail of gunfire.

Marr was charged in both incidents. His defense in both was self-defense. That defense, in this case, came through

statements he gave to the police upon his arrest, as Marr did not testify. In his first statement, which was an oral one, he said nothing about self-defense. He told the officer that, believing that Carroll was responsible for his cousin's death, he and Alston went to Carroll's home, in a stolen van, "to talk to him about that," that Marr was armed with a Mac 11 semi-automatic machine pistol, and that, when he saw Carroll come out of his home and approach a waiting cab, he fired; one of the shots, he acknowledged, went into the cab. In an ensuing written statement, he claimed that he was both enraged and terrified when he learned about the earlier episode and that he went to see Carroll "to see what his feelings were and to see if things could be resolved, and if he would confess to the murder of my cousin." He and Alston were armed, he said, "for our protection." Just as they arrived, Carroll was about to enter a cab, and, apparently startled to see them, he "grabbed at his waist as if to draw a weapon." In fear of their lives, he and Alston opened fire.

In response to this evidence, which, in the Jackson case, was substantially similar, the trial court, in both cases, instructed the jury on the defenses of "perfect" and "imperfect" self-defense, using the language suggested in § 4:17.2 of the MARYLAND CRIMINAL PATTERN JURY INSTRUCTIONS, published by the Maryland State Bar Association. In both cases, Marr asked for two additional instructions, as follows:

> "In determining whether the defendant's conduct was reasonable under the circumstances, you should judge his conduct by the facts as you believe they appeared to him.
>
> A belief which may be unreasonable to a calm mind may be actually and reasonably held under the circumstances as they appeared to the defendant at the time of the incident."

In both cases, the trial court refused to give the additional instructions, and, in both cases, Marr appealed from the ensuing convictions, claiming, among other things, error in that refusal. In this case, the Court of Special Appeals applied its ruling in *Rajnic v. State,* 106 Md.App. 286, 664 A.2d 432 (1995) and, in an unreported opinion, held that the

refusal *did* constitute reversible error. We granted the State's petition for *certiorari* to determine whether the Court of Special Appeals erred in that judgment. In the second case, in a reported opinion filed five months later, the intermediate appellate court held the opposite—that the failure to give the additional instructions did *not* constitute reversible error. *See Marr v. State,* 134 Md.App. 152, 180–81, 184–87, 759 A.2d 327, 342, 344–46 (2000). Marr filed a petition for *certiorari* in that case, which we have held pending our decision in this case. We shall reverse the Court of Special Appeals in this case and, by separate order, deny Marr's petition in the other case.

## DISCUSSION

Maryland recognizes two varieties of self-defense—the traditional one, which we have sometimes termed "perfect" or "complete" self-defense, and a lesser form, sometimes called "imperfect" or "partial" self-defense. Although "perfect" self-defense is universally recognized in the United States, not all of our courts recognize the lesser variety as a separately defined defense, and there is no universal agreement on the precise elements of either variety. We shall focus, as we must, on the current state of the Maryland law, but, as we consider some of our earlier cases and cases from other States, we need to take into account the overall context in which those cases were decided.

■ We defined the defenses of "perfect" and "imperfect" self-defense, and the relationship between them, in *State v. Faulkner,* 301 Md. 482, 483 A.2d 759 (1984) and *Dykes v. State,* 319 Md. 206, 571 A.2d 1251 (1990). *See also State v. Martin,* 329 Md. 351, 357–58, 619 A.2d 992, 995, *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Jones v. State,* 357 Md. 408, 422–23, 745 A.2d 396, 403–04 (2000); and *Roach v. State,* 358 Md. 418, 429–32, 749 A.2d 787, 793–94 (2000). We noted that "perfect" or traditional self-defense, is a complete defense to a charge of criminal homicide—murder or manslaughter—and, if credited by the trier of fact, results

in an acquittal. The elements, or requirements, of that defense, as we enumerated them in *Faulkner* and *Dykes*, are:

"(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded."

*Faulkner*, 301 Md. at 485–86, 483 A.2d at 761; *Dykes*, 319 Md. at 211, 571 A.2d at 1254.

In *Faulkner*, we first adopted the concept of "imperfect" self-defense, as articulated in that case by the Court of Special Appeals. *See Faulkner v. State*, 54 Md.App. 113, 458 A.2d 81 (1983). The prospect of "imperfect" self-defense arises when the actual, subjective belief on the part of the accused that he/she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief. What may be unreasonable is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both. As we said in *Faulkner*, quoting from the Court of Special Appeals opinion:

"Perfect self-defense requires not only that the killer subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them. Imperfect self-defense, however, requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so."

*See State v. Faulkner*, 301 Md. at 500, 483 A.2d at 768–69 (quoting *Faulkner v. State*, 54 Md.App. at 115, 458 A.2d at 81

(footnote omitted)). *See also State v. Martin, supra,* 329 Md. at 357–58, 619 A.2d at 995. We added in *Burch v. State,* 346 Md. 253, 283, 696 A.2d 443, 458, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997), that

> "the only substantive difference between the two doctrines, other than their consequences, is that, in perfect self-defense, the defendant's belief that he was in immediate danger of death of [sic] serious bodily harm or that the force he used was necessary must be objectively reasonable. In all other respects, the elements of the two doctrines are the same."

■ Unlike its "perfect" cousin, "imperfect" self-defense, if credited, does not result in an acquittal, but merely serves to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter. As we explained in *Faulkner* and repeated in *Dykes,* a defendant who commits a homicide while honestly, though unreasonably, believing that he/she is threatened with death or serious harm and that deadly force was necessary does not act with malice, and, absent malice, cannot be convicted of murder. Nonetheless, because the killing was committed without justification or excuse, the defendant is not entitled to full exoneration and would be guilty of voluntary manslaughter. *Faulkner,* 301 Md. at 501, 483 A.2d at 769; *Dykes,* 319 Md. at 213, 571 A.2d at 1255. *See also Roach v. State, supra,* 358 Md. at 430–31, 749 A.2d at 793–94.

In adopting and defining the doctrine of "imperfect" self-defense in *Faulkner,* we noted that, despite its early antecedents in England, it was regarded by some as being "a recent theory not far advanced," that it had not been universally adopted, and that, where it had been accepted, it had been "subjected to different interpretations." *Faulkner,* 301 Md. at 486, 483 A.2d at 762. Some courts, we observed, applied the doctrine only where "perfect" self-defense would apply but for the fact that the defendant initiated the confrontation at the non-deadly level. Other courts found "imperfect" self-defense applicable when the defendant committed the killing because

of an honest, though unreasonable belief of the imminence of death or serious bodily harm, and still others applied it when the defendant satisfied all other aspects of "perfect" self-defense but used unreasonable force in defending himself. We found the middle approach the most appropriate, declaring as persuasive the reasoning given in *People v. Flannel,* 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1, 7 (1979):

"[T]he state has no legitimate interest in obtaining a conviction of murder when, by virtue of defendant's unreasonable belief, the jury entertains a reasonable doubt whether defendant harbored malice. Likewise, a defendant has no legitimate interest in complete exculpation when acting outside the range of reasonable behavior. The vice is the element of malice; in its absence the level of guilt must decline."

The definitional pronouncements from these cases, in a somewhat reordered sequence, have been carefully formulated into the pattern jury instruction, drafted by the Maryland State Bar Association's Standing Committee on Pattern Jury Instructions, that was given in this case. The jury was told that Marr should be acquitted, on a theory of self-defense, if the jury found that (1) he was not the aggressor or, if the initial aggressor, did not raise the fight to the deadly force level, (2) he "actually believed" that he was in immediate and imminent danger of death or serious bodily harm, (3) his belief "was reasonable," and (4) he used no more force than was reasonably necessary. The court instructed further that, even if the jury was unable to find each of those four elements, it could find that Marr acted in "partial self-defense" if he "actually believed he was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed," and, if it found that to be the case, the crime would be manslaughter rather than murder.

The two additional instructions requested by Marr were necessarily premised on the assumption that he actually believed that he was in imminent danger of death or serious bodily harm from Carroll and that the deadly force he em-

ployed was a necessary response to that threat, and they sought to focus the jury's attention on the reasonableness of those subjective beliefs. Those instructions thus related to the defense of "perfect," rather than "imperfect," self-defense. They would have the jury determine the reasonableness of the defendant's belief as to either of those elements by looking at things solely through his eyes and mind-state, regardless of how someone else, including the imaginary reasonable person, would have viewed the situation.

Marr urges that this concept or standard is required in a self-defense analysis and that it was not fairly covered in the other instructions given by the court. As we indicated, the Court of Special Appeals, believing that the issue was controlled by its decision in *Rajnic v. State, supra,* 106 Md.App. 286, 664 A.2d 432, agreed with him.

*Rajnic* involved a situation in which the defendant, cornered in his own bedroom, to which he had retreated, was being besieged by three larger men who were in the adjoining hallway threatening to beat him. Fearful of a violent confrontation, Rajnic had made ready a shotgun and a handgun, and, when the three men burst into his bedroom, he shot them. His defense was self-defense, and he complained on appeal about the rejection of a number of requested jury instructions, one of which was similar to the second instruction requested here—that in determining whether his conduct was reasonable, the jury should keep in mind that a belief which may be unreasonable to a calm mind may be actually and reasonably held under the circumstances as they appeared to the defendant at the time of the incident.

Quoting from *Winner v. State,* 144 Md. 682, 686, 125 A. 397, 398 (1924) and citing as additional authority a recommended jury instruction found in DAVID AARONSON, MARYLAND CRIMINAL JURY INSTRUCTIONS AND COMMENTARY § 5.14 (2d ed.1988), the *Rajnic* court held that "[ i]t is well-established that a defendant's claim that self-defense was necessary 'should be judged by the facts as they *appeared to him,* whatever they truly were.'" *Rajnic,* 106 Md.App. at 296, 664 A.2d at 437. That

statement, which first appears in a passage from 3 BISHOP'S NEW CRIMINAL PROCEDURE (2d ed.) 1599, quoted in *Winner,* needs to be placed in context.

*Winner,* a 1924 case, involved a confrontation between the defendant, a union miner in Allegany County, and the victim, Hawkins, who had earlier threatened to kill every union man in the village. The confrontation ended with Winner shooting at Hawkins, for which he was convicted of assault (and acquitted of more serious charges, including assault with intent to kill or maim). There was a dispute as to the exact circumstances that led immediately to the shooting, other than that Winner was standing on the porch of his home and Hawkins was in the alley abutting the back yard. Winner claimed that, without any provocation from him, Hawkins was making "a hostile demonstration and homicidal threats against him and his family, and was apparently about to draw a pistol from his hip pocket and to climb the wire fence between the alley and [Winner's] lot." *Winner,* 144 Md. at 684, 125 A. at 397–98. Hawkins, on the other hand, claimed that he was innocently in the alley when Winner announced his intention to shoot him and promptly did so.

In support of his defense of self-defense, Winner offered evidence that, shortly before the confrontation, Hawkins engaged in disorderly and threatening conduct that Winner had witnessed and had also made threats to kill, of which Winner was then unaware. The trial court excluded that evidence as irrelevant, and that was the issue on appeal. Quoting from 13 *Ruling Case Law* 920, we concluded that, "on the issue [of] whether or not the accused had reasonable ground to believe himself in imminent danger, he may show his knowledge of specific instances of violence on the part of the deceased" and that such knowledge may come from both actual observation as well as general repute. It was in the course of that discussion that we quoted this passage from 3 BISHOP'S NEW CRIMINAL PROCEDURE (2d ed.) 1559:

"Under a claim of self-defense, where the necessity for the defendant's resorting to it should be judged of by the facts as they *appeared to him,* whatever they truly were, he may

give in evidence whatever he knew of the character, prior conduct, threats or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and circumstances he was dangerous, might reasonably have place among the considerations guiding his actions."

We paraphrased much of what we said in *Winner* in *Jones v. State*, 182 Md. 653, 35 A.2d 916 (1944). Jones was charged with murdering his wife, with whom he had had a more than contentious relationship over the years. There was evidence that she had thrown an iron at him a few weeks earlier and that the killing occurred after she had smacked him in the mouth and, in a drunken condition, was chasing him down the road, possibly carrying an ice pick. He claimed that, when he stopped running and turned around, he saw her swipe at him with a sharp instrument and that, in response, he pulled a knife from his pocket and killed her. The question, as relevant here, was whether the court erred in disallowing evidence that, three weeks earlier, the victim, while drunk, had attacked three police officers. Our holding was that, when there is evidence tending to support a theory of self-defense, "[i]t is competent for him to prove his knowledge of facts which would have a reasonable tendency to justify his asserted belief as to the existence of a deadly purpose in the overt acts of the deceased." *Id.* at 659, 35 A.2d at 919. In that context, we paraphrased some of what we had said in *Winner*, including the passage from Bishop's work:

"Where the defendant claims that he acted in self-defense, and there is some testimony of an overt act on the part of the deceased and some testimony tending to support the theory of self-defense, where the necessity for the defendant's resorting to it should be judged of by the facts as they appeared to him, whatever they truly were, he may give in evidence whatever he knew of the character, prior conduct, threats or other utterances of the person with whom he was contending, which is admitted in evidence, not

to show that the deceased was bad, but in this special instance was dangerous."

*Jones*, 182 Md. at 660, 35 A.2d at 919.

We have not repeated that passage from Bishop's work since *Jones*, and we have never held that the bare statement that "the necessity for the defendant's resorting to [a theory of self-defense] should be judged by the facts as they appeared to him, whatever they truly were," devoid of its evidentiary context, was required as an instruction to the jury. The problem with the statement is that it is too broad and therefore could be misleading. We do not disavow the notion that, as part of a self-defense analysis, the trier of fact must look at the circumstances as they appeared to the defendant, for that is important in understanding the defendant's explanation for his or her conduct. It provides the necessary underpinning for the defendant's subjective beliefs that (1) he/she was in imminent danger, and (2) the force used was necessary. When judging the reasonableness of the defendant's conduct, however, that notion has some limits. Our jurisprudence, pre-dating *Faulkner*, is consistent with an objective, rather than a subjective, standard of reasonableness.[1]

---

1. Other States have wrestled with this question as well, but their conclusions, sometimes reached in the context of a self-defense law that is different from that applied in Maryland or a situation quite different from that facing us here, are not particularly helpful in light of our own well-established jurisprudence. In *State v. Leidholm*, 334 N.W.2d 811 (N.D.1983), the court observed that, in determining whether a defendant's beliefs or conduct were reasonable, there was some difference of opinion as to whether the standard of reasonableness is an objective or subjective one, the difference being whether the trier of fact was to view the circumstances surrounding the accused from the standpoint of a hypothetical reasonable person or simply to determine whether the circumstances were sufficient to induce in the accused an honest and reasonable belief that he must use force to defend himself. The North Dakota court opted for the subjective approach, that allows the jury "to judge the reasonableness of the accused's actions against the accused's subjective impressions of the need to use force." *Id.* at 818. That determination, however, was made in the context of a statutory self-defense law modeled largely on the American Law Institute Model Penal Code that does not draw the same distinction between "perfect" and "imperfect" self-defense that is imposed in Maryland. *See also State v. Wanrow*, 88 Wash.2d 221, 559 P.2d 548, 558 (1977), finding

■ It has always been a requirement of "perfect" self-defense in Maryland that the defendant's belief of imminent death or serious bodily harm and the need to respond with the amount of force used "coincide with that which would have been entertained under the same circumstances by a person of average prudence." *Guerriero v. State,* 213 Md. 545, 549, 132 A.2d 466, 467 (1957). Not only must the defendant have the subjective belief, but "the circumstances [must be] such as to warrant reasonable grounds for such belief in the mind of a man [or woman] of ordinary reason." *Bruce v. State,* 218 Md. 87, 96–97, 145 A.2d 428, 433 (1958); *DeVaughn v. State,* 232 Md. 447, 453, 194 A.2d 109, 112, *cert. denied,* 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964). We made clear in *Faulkner, supra,* 301 Md. at 500, 483 A.2d at 768–69, that, not only must the defendant subjectively believe that his actions were necessary "but objectively, that a reasonable man would so consider them."

■ The objective standard does not require the jury to ignore the defendant's perceptions in determining the reasonableness of his or her conduct. In making that determination, the facts or circumstances *must* be taken as perceived by the defendant, even if they were not the true facts or circumstances, *so long as a reasonable person in the defendant's position could also reasonably perceive the facts or circumstances in that way. See State v. Simon,* 231 Kan. 572, 646 P.2d 1119, 1122 (1982); *State v. McNair,* 54 Conn.App. 807, 738 A.2d 689, 697, *cert. denied,* 251 Conn. 913, 739 A.2d 1249 (1999); *Perryman v. State,* 990 P.2d 900, 904 (Okla.Crim.App. 1999); *In Interest of A.D.R.,* 499 N.W.2d 906, 910 (S.D.1993). If the fact or circumstance relied upon by the defendant to

error in a self-defense instruction that used the male pronoun throughout as not taking proper account of the fact that the defendant, a woman five foot four inches in height, with a broken leg and in a cast, was facing a six foot two inch intoxicated man. *Compare,* however, *State v. Simon,* 231 Kan. 572, 646 P.2d 1119, 1122 (1982), opting for an objective standard, that "[a] reasonable belief implies both a belief and the existence of facts that would persuade a reasonable man to that belief." *See also State v. Baker,* 103 Idaho 43, 644 P.2d 365 (Ct.App. 1982), to the same effect.

justify a belief of imminent danger or the need to use deadly force to meet that danger is so improbable that no reasonable person in the defendant's position would perceive it to be the case, the jury cannot be directed to assume that fact or circumstance in judging the reasonableness of the defendant's conduct, for that would skew the whole analysis of reasonableness.

A belief, as to either imminent danger or the amount of force necessary to meet that danger, is necessarily founded upon the defendant's sensory and ideational perception of the situation that he or she confronts, often shaded by knowledge or perceptions of ancillary or antecedent events. The perception that serves as the impetus for responsive action may be incorrect for a variety of reasons, ranging from ignorance of relevant facts that, if known, would put the situation in a different light, to distortions in sensory perceptions, to judgmental errors in the instantaneous assimilation and appreciation of the apparent situation. The fact that the defendant's perception is incorrect does not necessarily make it unreasonable; human beings often misunderstand their surroundings and the intentions of other people. A defendant who is suddenly grabbed by another person at gunpoint may reasonably believe that the person is an assailant intending to do him immediate and grievous bodily harm, even though, in fact, the person is a plain clothes police officer possessing a valid warrant and properly, though forcibly, attempting to arrest him. Similarly, the defendant, confronted by a person with a gun, may reasonably, though incorrectly, believe that the gun is real or is loaded, when, in fact, it is not. In those kinds of circumstances, the jury would have to determine the reasonableness of the defendant's conduct in light of his reasonable, though erroneous, perception. *See Starr v. United States*, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841 (1894). If, however, on Halloween, the defendant confronts a costumed stranger on the street and shoots him in the honestly held belief that the stranger is a menacing alien from Mars intent upon his immediate destruction, the jury is not entitled to judge the reasonableness of the defendant's conduct on the assumption

that the victim was, in fact, an alien from Mars intent on harming the defendant.[2]

 The adoption of the language from Bishop's work in *Winner* and the paraphrasing of it in *Jones* were probably unnecessary, but not improper in the context of addressing the evidentiary questions raised in those cases. When taken out of that context, however, it is important to note that the language was used before we adopted the doctrine of "imperfect" self-defense and sharpened the definition of "perfect" self-defense. The instructions requested here, unshorn of context, could create a real danger of blurring the distinction we have carefully crafted between "perfect" and "imperfect" self-defense and allow a jury to find a defendant's belief, either of imminent death or serious harm or of the need to use deadly force, to be reasonable when the cognitive perception leading to that belief is wholly unreasonable. The effect of that would be to apply "perfect" self-defense and acquit the defendant, when only "imperfect" self-defense, warranting a reduction of the crime to manslaughter, is appropriate.

It is not our function in this case to draft a jury instruction that properly focuses the jury's attention on the circumstances as perceived by the defendant. We simply conclude that, in light of the other instructions given by the court, the addition-

2. Professor Aaronson's suggested self-defense instruction, cited by the *Rajnic* court, does not support that court's statement, but recognizes that, to warrant a finding of "perfect" self-defense, the circumstances under which the defendant acted must be such as would produce a belief of immediate danger in the mind of a reasonable person. In pertinent part, Aaronson's proposed instruction reads as follows: "In considering the evidence relating to self-defense, the question is *not* whether you believe, looking backward in time, that the use of force was necessary. The question is whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually believed he was in imminent danger of … serious bodily harm or death … *and had reasonable grounds for that belief. In considering the reasonableness of the defendant's belief, you should consider whether the circumstances under which the defendant acted were such as would produce in the mind of a reasonably prudent person, similarly situated, the belief that he was in imminent danger of … serious bodily harm or death.*" Aaronson, *supra*, § 5.11 (emphasis added).

al instructions requested by Marr did not do so and, for that reason were properly rejected.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO CONSIDER THE REMAINING ISSUES; COSTS IN THIS COURT TO BE PAID BY RESPONDENT; COSTS IN THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.