IN THE

# SUPREME COURT OF APPEALS

OF

# VIRGINIA.

## Richmond.

### PARRISH v. THE COMMONWEALTH.

#### NOVEMBER 28th, 1884.

1. CRIMINAL JURISDICTION AND PROCEEDINGS—*Justifiable Homicide—Definition.*—Where one in defence of his person, habitation or property, kills another, who manifestly intends and endeavors by violence or surprise to commit a forcible or atrocious felony upon either, such killing is justifiable homicide. And in such case, the justification of the prisoner must depend on the circumstances as they appear to him.

2. IDEM—*Evidence—Prisoner's admissions.*—If the prosecution uses prisoner's statements, the whole must be taken together, and one part cannot be selected and another left out.

3. IDEM—*Cropping—Ownership of crop—Larceny.*—Where land owner contracts with one to crop his land and to give him part of the crop after paying all advances, and the crop has not been divided, such cropper is not a tenant, but a mere employe, and the ownership of the entire crop is in the land owner, and if cropper forcibly, or against consent of land owner, takes the crop from the possession of the latter, such taking is larceny, robbery, or other offence, according to the circumstances of the case.

4. IDEM—*Case at bar.*—A case of justifiable homicide.

Error to the judgment of circuit court of Goochland county, rendered as its April term, 1884, overruling the motion of Alexander L. Parrish, plaintiff in error, for a new trial, and sentencing him to confinement in the penitentiary for seven years in accordance with the verdict of the jury then rendered against him, finding him guilty of murder in the second degree of A. J. Mitchell, for which said plaintiff stood indicted. Parrish had contracted to let Mitchell cultivate his land and to give him part of the crop after paying advances by Parrish to him. The crop had not been divided, but it was evident that the advances exceeded Mitchell's share. The whole was in the possession of Parrish, and had been placed in his tobacco house and nailed up in the presence of Mitchell, who was forbid by Parrish to remove any part of it until the advances were paid. But, at night, against the consent of Parrish, Mitchell came with a cart to remove it, and armed with an axe, proceeded to break open the tobacco house, and though warned of his peril, made threats and demonstrations of violence, not only in endeavoring to break open the tobacco house, but also upon the person of Parrish; who, being armed with a single barreled fowling-piece, loaded with small shot, fired at Mitchell and caused his death.

Opinion states the facts in detail.

*Pettit & Leake*, for the plaintiff in error.

*F. S. Blair*, Attorney-General, for the Commonwealth.

FAUNTLEROY, J., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court of Goochland county, rendered at its April term, 1884, overruling the motion of plaintiff in error for a new trial, and sentencing

him to confinement in the penitentiary for seven years, in accordance with the verdict of the jury then rendered against him finding him guilty of murder in the second degree in a prosecution for murder, therein pending, for the killing of A. J. Mitchell. The record discloses the following case:

On February 3d, 1882, Alexander L. Parrish, the plaintiff in error, and one A. J. Mitchell, the deceased, entered into a written contract, by which the said Parrish employed the said Mitchell to cultivate and secure crops on his farm in said county, during the current year, and to pay him in a part—one-half—of the crops, instead of money, for his labor and services. It was stipulated in said agreement that Parrish should furnish Mitchell with corn and other specified necessaries for the support of himself and his family while he should be engaged in his said service, and should pay himself therefor out of the part of the crops which would be going to said Mitchell. Parrish was also to pay himself out of Mitchell's said share for certain expenditures in employing other laborers, and in supplying and repairing tools, &c. The said Mitchell was very poor, and had a wife and five children, all young, and was utterly unable to procure those necessaries in any other way. Indeed, the plaintiff in error had, before the date of the said contract, already furnished him with some supplies to live on. Plaintiff in error, Parrish, kept an accurate itemized account of everything furnished to Mitchell by him; and when the crops, the results of Michell's labor, were made and being garnered in the fall, while Mitchell was shucking and housing the corn, in October or November, Parrish called Mitchell's attention to the amount of his account—$85.06, which Mitchell vehemently disputed, and protested that he would not pay it, or suffer Parrish to pay himself out of his share of the crops, as the contract provided it should be paid.

The whole crop of corn amounted to only about thirty-one

barrels—good, bad and worthless, all told; and the tobacco when sold netted the sum of $18. It was thus, indisputably, apparent that Mitchell's one-half interest in the crops produced would not pay the amount of Parrish's account for necessaries supplied by him to Mitchell under the contract. After the corn was all shucked and was being housed, Mitchell put about twenty barrels of it in Parrish's corn house, which was in about ten yards of his dwelling-house, and he positively refused to put the remaining ten barrels of it in the said corn house, where he was required by Parrish to put it and where he had put the said twenty barrels; but, against the will and protest of Parrish, he put the said ten barrels of corn in a tobacco house, in which the tobacco raised had been put, and which was about one hundred yards from the dwelling-house, but within the same curtilage enclosure with the dwelling-house and other outhouses of Parrish. Mitchell had, a short time before, put a lock on the door of the tobacco house, in which the tobacco was hanging unstripped, and held the key to it, and having in this way put this portion of the corn into it, locked the door and kept the key; whereupon, Parrish, at once, and in Mitchell's presence, expressly asserting and declaring his ownership, control and custody of both the house and its contents, further and securely fastened the door by nailing a plank and a slat across it. Apprehending from the conduct and manner of Mitchell that he would use force and inflict violence upon the property, as well as upon his person, Parrish determined, and actually proceeded, to obtain a peace warrant against Mitchell; which, however, he did not at once procure from fortuitous circumstances, and an interview had with Mitchell on the day of his death allayed his apprehensions and deluded him (designedly and cunningly by Mitchell, as the light of his subsequent conduct that very evening clearly reveals) into the belief that it was not then necessary.

About 9 o'clock p. m. of that same day, a negro man, one
Nuckols, whom Mitchell had engaged to aid him in taking
away the corn from the tobacco house, came to Parrish's dwell-
ing-house, where he was sitting with his family, consisting of
his father, over eighty years of age; his aunt, over eighty years
old; his maiden sister, and his cousin, Miss Parrish, a visitor;
and, just as they were about to retire peacefully, for the night,
disturbed the quiet and repose of the household by informing
Parrish that Mitchell, at that hour of the night, was coming
to take and carry away the corn, and that he was not satis-
fied with Mitchell's statement and assurances that he had a
right to take the corn because he had made it all right with
him, Parrish.   Parrish told Nuckols that it was not all right;
that Mitchell had no corn there; and that if he came with
Mitchell to break his house he would have him arrested.
Parrish, believing that he had a right to protect his property
and his domicile from hostile invasion, determined to go to the
tobacco house, which was within his dwelling-house enclosure,
and a part of his curtilage; and his fears and his prudence
reasonably suggested the wisdom and necessity of taking his
gun, which was a single barrel fowling-piece, loaded with
small sized shot, and which had been loaded for a long time.
He and his sister Virginia, and their cousin, Margaret Parrish,
proceeded, in the darkness, to the tobacco house.   Soon after
getting there another man named Archer Dandridge, whom
Mitchell had engaged, with a cart to carry off the corn, came
up driving the cart; when he was told, as Nuckols had been,
that Mitchell had no corn there, and could get none unless he
stole it; and was advised to leave, being admonished that Par-
rish would as soon shoot him as anybody else who attempted
to rob him of his corn; and the said Archer Dandridge did
leave with his cart.   About the same time the loud and bois-
terous talking of Mitchell, and a light down in the pines, some

thirty yards off from the tobacco house, attracted attention. Miss Virginia Parrish and her cousin, Miss Margaret Parrish, at the request of Parrish, the plaintiff in error, to go and try to dissuade or prevent Mitchell's further approach, went forward and found Mitchell in a violent passion, with a torch of lightwood in one hand and an *axe* in the other, and his wife and his sister-in-law *hanging on to him* and pulling at him, and beseeching him to relinquish his purpose and to go back home. His wife's sister took the axe from him and dropped it in the path, and Miss Virginia Parrish picked it up and threw it out into the pines. All four of these ladies appealed to him to go back. Miss Virginia Parrish called his attention to the condition of his wife, and to her own feeble condition, imploring him to consider and heed these, but he shook them off, saying that he did not intend to hurt *them;* but, with dreadful profanity, declaring his intention of going into that house and getting, then and there, his corn *or die.* Miss Virginia Parrish, as a last resort, told him her brother, Parrish, was at the tobacco house and had his gun with him, and had been advised by his lawyer that he had a right to shoot him if he could not prevent his breaking into the house in any other way. His reply was: "God damn it, I am going to hell anyhow, let me go and be shot;" and his language and demeanor were violent and threatening. About this point the torch went out, and his wife and her sister, Mrs. Clough, turned and went back. All this had taken place some twenty-five or thirty yards from the tobacco house. Virginia and Margaret Parrish then turned and went back along the path to the tobacco house; passed through the gate at the end of it, and closed and chained it, and stood up against it to prevent Mitchell from entering. Mitchell seeing them against the gate, jumped over the fence and rushed around to the front of the tobacco house, exclaiming, in a fierce and threatening manner, "Where is the man

who is going to shoot me?" He went to the door and began to break it open. Parrish, the plaintiff in error, was standing a little way off from the tobacco house, within hearing of all that occurred. He had heard all that transpired in the pines, twenty-five or thirty yards off. He heard what Mitchell exclaimed as he went around to the door; and he heard the boards ripped from the door. It was a dark and chilly night, and though he could indistinctly make out the moving body of the assailant, he could not see what he had in his hands, and he believed that he was armed. He aimed at the largest part of his body, intending to disable him, lest he should kill him if he failed to disable him by the shot from the gun. Parrish had no idea or intent to kill the robber, and was greatly surprised and grieved at the fatal effect of the small charge in the gun. He said to Mitchell: "I am sorry you are so badly hurt; I did not intend to kill you."

The evidence being certified by the court below, according to the rule of this court we will consider only the evidence adduced by the Commonwealth and the account set forth in the record, which is documentary, and disregard all the oral evidence offered on behalf of the plaintiff in error, which is in conflict with the evidence for the Commonwealth.

The contract of February 3d, 1882, between Mitchell and Parrish settles the status of Mitchell to have been that of a mere employe or cropper. Parrish had furnished Mitchell with a house and lot, free of charge, on a different place from that on which Mitchell cropped for Parrish, and nearly a mile away. Mitchell was entitled to nothing until Parrish had been fully reimbursed, out of Mitchell's share of the crops, for whatever Mitchell might owe to him for supplies, and otherwise. He was therefore no *tenant.* Parrish was to pay him for his services, and the arrangement was only a mode of paying for Mitchell's labor. 2 Minor's Inst. 159. There had been no

division of the crops; the tobacco had not been sold nor even stripped and prepared for market; and it was shown by the evidence for the Commonwealth that the corn in the tobacco house, and the tobacco house itself, were Parrish's, and that there had been no division of the crops. Mitchell had, therefore, no interest in the corn or other crops. *Taylor's Landlord and Tenant, page* 21, *note* 6, and cases there cited.

Mitchell could not have any rights in the crops till a division, and no right to be on the premises except as the employe of Parrish; and Parrish had the same right to prevent the taking of his corn by one who, though in his employ, endeavored to deprive him of it by violence, and putting him in fear that he would have had to prevent any other employe from forcibly taking money from his person, or his safe, upon a false claim that he owed him money-wages.

It was Mitchell's duty to strip the tobacco and prepare it for market, and for this purpose he had the key of the tobacco house; yet, in order to negative, in the most emphatic manner, any claim of Mitchell to take the corn, or any part of it, out of the house, Parrish, in his presence, and without any remonstrance upon Mitchell's part, securely nailed up the door of the tobacco house. With a consciousness that he had no claim against Parrish which he could establish before the legal tribunals of the country appointed to settle all such matters, Mitchell deliberately determined to invade Parrish's premises in the darkness of the night, and by force and violence, and with a high hand, to plunder him of his property. And when Nuckols, after he had warned Parrish of Mitchell's purpose and approach, met Mitchell and told him that Parrish would resist his going into the tobacco house, he demonstrated his determined recklessness by declaring that he would go into the house that night, and get the corn, *or die.*

Parrish, surprised in the night, remote from the help of neigh-

bors, surrounded by a helpless family of delicate females, and a father and aunt both over eighty years of age, stood forth to repel the invasion of his most sacred rights; and, actuated by an impulse which would have been followed by every person, wearing even the semblance of manhood, and at the suggestion of Nuckols, who said it might keep Mitchell from breaking in, he took down his gun, which was hanging in his room, and which was thought to have only a small load of small shot in it, and which had been loaded a long time, and went out with his sister and cousin Margaret to the tobacco house, which was near the gate through which Mitchell would have to pass in order to enter the enclosure of his dwelling-house. And when Archer Dandridge came up with the cart, the words of Parrish to him, telling him that Mitchell had no corn there unless he stole it, and that he had just as soon shoot him as Mitchell if he persisted in the purpose of breaking and carrying away his property, showed that he had no malice towards Mitchell, and only desired to defend his property and his premises from violent invasion and robbery under the cover of a dark night. And when they heard Mitchell coming, and saw the light which he carried in his hand, instead of meeting Mitchell himself, and thus still further exasperating his already furious mood and subjecting himself to bodily harm, as he undoubtedly would have done, Parrish sent Margaret Parrish to help his sister Virginia, and the wife and sister-in-law of Mitchell, to dissuade him from his lawless designs and to turn him from his declared course of violence and wrong. But nothing but a superior physical force could deter him; he was violent and profane, desperate and determined—on he came with his coat off, speaking in a loud and threatening tone, and leaped over the fence, exclaiming, as he rushed up to the tobacco house door as if he would tear Parrish to pieces, "Where is the man that is going to shoot me?" Was this demonstration simply

to get the corn? Mitchell had been told by Nuckols that Archer Dandridge had gone away with the cart. He had nothing whatever with which to carry away any corn. What then could be the motive and design of this conduct of this lawless assailant, whose reckless fury but grew more ungovernable as opposition crossed his path? No effort had been spared to avert the collision which all saw would inevitably result; all means of peaceful remonstrance and opposition had been exhausted, and there only remained the exercise of that self-defence which is guaranteed to all men by the law of the land. Parrish, alarmed at all that he had seen and heard, and bullied, bearded and assailed in the darkness of a murky night in his humble home, and in the very presence of his helpless family, and conscientiously believing from Mitchell's furious demonstration of challenge to bring him within his grasp, that he was armed and would kill him if he caught sight of him, fired his gun, in the hope to disable him, while he was in the act of breaking into the tobacco house with avowed felonious intent. The imminence of danger was as apparent to Parrish as if he had seen a pistol in Mitchell's hand. The circumstances of time, place and surroundings awakened the gravest apprehensions of Parrish that Mitchell had felonious design against both his person and his property. Mitchell was armed with an axe. Why did his wife and sister-in-law exhibit such anxiety to get it from him, and not leave him until it had been taken from him in his scuffle with the four women? Why did they follow and cling to him for nearly a mile, imploring him to desist and turn back from his evil purpose? Why were they not examined by the Commonwealth upon this point? They were fully aware, most probably, of Mitchell's evil designs, at which they were so horrified and alarmed that they braved the chill and darkness of that November night, and for nearly a mile clung to him with expostulation and warning against his intended wrong.

When violence is used to obtain possession of property with a felonious intent, it will none the less amount to robbery because the thief has recourse to some colorable or specious pretence or claim of right, to effect his purpose. 1 Russell on Crimes, 876. But the peculiar circumstances under which Mitchell made the raid upon the premises of Parrish refute the idea or pretension that he came under a claim of right. Invading the curtilage and the peace of Parrish, in the darkness of night, with force, threats and violence; armed with an axe, and fiercely challenging the owner, whom he had just been warned was on the ground to resist and repel his attempt, to show himself; and forcibly breaking open the house, places him without the pale of the law. The breaking and entry of that tobacco house by Mitchell, with intent to take and carry away the corn therein, would have been a felony; and the same act done in the presence of Parrish, " by violence and putting him in fear," would have been robbery. And if Mitchell, as the employe of Parrish, had been in the custody of the corn in the tobacco house (which had been withdrawn from his custody by Parrish when he nailed up the door) by common law, as well as by statute, his wrongful and fraudulent conversion thereof would have been *larceny.* Wharton's Am. Crim. Law, 654–5, and Crim. Procedure, chapter 3, section 19. And under the twenty-first section of said chapter three, of the New Criminal Procedure, even if it were true, as contended below by the the prosecution, that Parrish had only a lien on Mitchell's share of the corn for the advances made him by Parrish, the taking and carrying away of the corn by Mitchell, under the circumstances, would have been larceny.

And all question as to the employe, in cases of contract similar to that between Mitchell and Parrish, being allowed to interpose a plea of a " claim of right," as an immunity to criminal conduct, like Mitchell's, is expressly negatived by the

decided cases. *State* v. *Jones*, 2 Dev. and Bat. 544; *State* v. *Gay*, 1 Hill, 364. In the case of *State* v. *Gay*, *supra*, it was held that "one who is entitled to a share of the crop for his services on the plantation of another is not a joint tenant, or tenant in common with his employer in the crop produced. It is exclusively the property of the employer; though he has made an executory contract to allow a certain portion of it to the cropper; and the latter may commit larceny in stealing a part of the gathered crop."

We come now to consider the extent to which appellant was justified in going to defend his person and property against the high-handed and violent outrage which Mitchell was endeavoring to perpetrate.

The tobacco house was in Parrish's curtilage, and it had therefore all the privileges and the protection of the capital or dwelling-house. Blackstone's Com. 225; Davis' Crim. Law, 150.

Wherever the party shall be forcibly attacked, in person or property, it is lawful to repel force by force, and the breach of the peace which happens is chargeable upon him only who began the affray. For the law in this case respects human passions, which no prudential motives are for the most part strong enough to restrain; considering, moreover, that the future process of the courts is by no means an adequate remedy for injuries accompanied by force, since it is impossible to say to what wanton lengths of rapine or cruelty outrages of this sort might be carried, unless it were permitted a man immediately to oppose one violence with another. 4 Minor's Inst., page 5, and cases there cited. Sir Matthew Hale says: The right of self-defence in these cases is founded in the law of nature, and is not, nor can be superseded by the law of society. The true principle upon which rests our right of defending either our persons or our goods is this: the law of nature does not oblige us to give them up when any one has a mind to hurt them or

to take them from us, and this is evident because our right to them would be unintelligible, or would, in effect, be no right at all, if we were obliged to suffer all mankind to treat them as they pleased without endeavoring to prevent it. Rutherforth's Institutes, 187–8. This right of defence is indefinite in its extent, and while legal principles are general their application to particular cases must always depend upon special circumstances. "The law allows us to defend our persons and our property; and such general allowance implies that no particular means of defence are prescribed to us. We may, however, be sure that whatever means are necessary are lawful, because it would be absurd to suppose that the law of nature allows of defence and yet forbids us, at the same time, to do what is necessary for the purpose. From hence it follows that he who attempts to injure us, gives us an indefinite right over his person, or a right to make use of such means to prevent the injury *as his behavior and our situation make necessary.*" (Rutherforth's Institutes.) *Idem.*

"It is plain from the foundation of this right that it must be an indefinite one, or that we are not debarred from proceeding to extremities, in the defence of our goods, where the obstinate injustice of such as would take them from us makes this behavior necessary." *Idem,* p. 195–6.

"If any person attempts a robbery or murder of another, or attempts to break open a house in the *night time,* and shall be killed in such attempt the slayer shall be acquitted and discharged." 4 Black. 180; and this is the law here. On page 224 of 4th vol. Blackstone, says: "We have seen in the case of justifiable homicide how much more heinous all laws make an attack by night rather than by day, allowing the party attacked by night *to kill the assailant with impunity.*"

Justifiable homicide "takes place when a man, in defence of his person, habitation or property, kills another who manifestly

intends and endeavors, by violence or surprise, to commit a forcible or atrocious felony upon either. In cases to which this ground of justification applies, no felony has been committed, but only attempted; and the homicide is justifiable in order to prevent it. This right of self-defence is founded upon the law of nature, which confers upon every individual the right to defend and maintain the possession of that which belongs to him by those means which are necessary to attain this object. The law interposes no prohibition against the exercise of the natural right of self-defence, which therefore exists in full force." Davis' Crim. Law, pp. 70–71. It makes no difference whether the offence intended by the assailant, were a felony at common law, or only created so by statute; "since whenever a statute makes any offence felony, it incidentally gives it all the properties of a felony at common law." *Idem* 156; *Pond's Case,* 8 Michigan, 150; *Moore's Case,* 31 Conn. 479; *Gray* v. *Coombs,* 7 J. J. Marshall, 478.

In the leading case of *People* v. *Pond,* already referred to, and stated in full in Horrigan and Thompson's cases of self-defence, 814, the court said the rules which make it excusable or justifiable to destroy life under some circumstances, are really meant to ensure its general protection. "They are designed to prevent reckless and wicked men from assailing peaceable members of society by exposing them to the danger of fatal resistance at the hands of those whom they wantonly attack, and put in peril or fear of great injury or death; and such rules, in order to be of any value, must be, in some reasonable degree, accommodated to human character and necessity. They should not be allowed to entrap or mislead those whose misfortunes compel a resort to them."

In the case at bar, the Commonwealth introduced the admissions or statements of Parrish to prove the killing; and, according to all the authorities, "if a prosecutor uses the declaration

of a prisoner, he must take the whole together, and cannot select one part and leave another; and if there be either no evidence in the case or no other evidence incompatible with it, the declaration so adduced in evidence must be taken to be true." Roscoe's Crim. Evidence, 52–3; 1 Phillips on Evidence, 537; *Brown's Case,* 9 Leigh, 633. All the evidence introduced for the Commonwealth corroborated Parrish's declaration to the witness Aldhizer, "that he" aimed at the largest part of Mitchell's body, as it was night, for fear Mitchell would kill him unless he disabled him, as he expected he was armed." But the appearances of danger justified Parrish in shooting. In *Stoneman's Case,* 25 Gratt. 887, the court say: "If S. shot E. under a reasonable apprehension that his own life, or that of some other member of his family, was in imminent danger, or under a reasonable apprehension that the deceased intended to burn the dwelling-house of his mother, or commit some other known felony, and that there was imminent danger of such design being carried into execution, he is justified in so doing, though such danger was unreal." "Men, when threatened with danger, must determine from appearances and the actual state of things surrounding them as to the necessity of resorting to self-defence; and if they act from reasonable and honest convictions, they will not be held responsible criminally for a mistake in the extent of the actual danger, where other and judicious men would have been alike mistaken. A contrary rule would make the law of self-defence a snare and a delusion. It would become a mockery of the sacred right of self-preservation." *Campbell* v. *People,* 16 Ill. 17: H. & T. 282.

"The guilt of the prisoner must depend upon the circumstances as they appear to him." *Parke B. in R.* v. *Thurston,* 1 Den. C. C. 387. This doctrine was approved in the cases reported in H. and T. of *Neely's Case,* 101; *Patten's Case,* 826; *Pond's Case,* 814; *Hurd's Case,* 840; *Harris' Case,* 276;

*Young's Case,* 401, *note; Collins' Case,* 596, *note; Shorter's Case,* 258, and cases there cited. "The owner of property in possession of the same has a right to use as much force as is necessary to prevent a forcible trespass; and where a trespasser goes with the intent and means to commit a felony if necessary to accomplish the end intended, the owner of the property may repel force by force to the extent of killing the aggressor. Where an armed trespasser goes to the place where the property of another is deposited, and, under a claim of right, attempt to remove it by force, and manifestly intends to kill the owner of the property if necessary to accomplish his purpose, and the owner shoots and kills such transgressor, this is excusable self-defence." *People* v. *Payne,* 8 Calf. 341, p. 863 of Horrigan and Thompson. In the light of the numerous standard authorities to which we have referred—both text writers and adjudged cases—applied to the peculiar circumstances of Parrish's situation as brought out by the evidence for the Commonwealth, we think that he acted in justifiable defence of his property, and under reasonable apprehension of the necessity to shoot the deceased to prevent great injury both to his person and his property, and that the verdict of the jury was not warranted by the evidence and is against the law of the case. The circuit court erred in not setting the verdict aside, and in refusing to award the prisoner a new trial.

The court erred in excluding the evidence of character, as set out in the first and third bills of exception. General character is always in issue in a criminal case; and evidence thereof is always admissible. Roscoe's Crim. Ev. 100; Phillips on Ev. 762. The judgment of the circuit court must be reversed and the case be remanded for a new trial.

LEWIS, P. and HINTON, J., dissented.

JUDGMENT REVERSED.