# JAMES CECIL LAW, JR. *v.* STATE OF MARYLAND

[No. 607, September Term, 1973.]

*Decided April 19, 1974.*

14

The cause was argued before THOMPSON, MOORE and LOWE, JJ.

*Luther C. West* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, John C. Hancock, State's Attorney for Charles County, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Daniel Cassidy, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

When James Cecil Law, Jr. purchased a thirty-nine dollar

shot gun for "house protection," he could not possibly have conceived of the ordeal it would cause him to undergo.

Mr. Law, a 32 year old black man, had recently married and moved to a predominantly white middle-class neighborhood. Within two weeks his home was broken into and a substantial amount of clothing and personal property was taken. The investigating officer testified that Mr. Law was highly agitated following the burglary and indicated that he would take the matter in his own hands. The officer quoted Mr. Law as saying: " 'I will take care of the job. I know who it is.' " The officer went on to say that Law told him " . . . he knew somebody he could get a gun from in D.C. and he was going to kill the man and he was going to take care of it." Two days later he purchased a 12 gauge shotgun and several "double ought" shells.

The intruder entered the Law's home between 6:30 and 9:00 in the evening by breaking a windowpane in the kitchen door which opened onto a screened back porch. The intruder then apparently reached in and unlocked the door. Law later installed "double locks" which required the use of a key both inside and outside. He replaced the glass in the door window in a temporary manner by holding it in place with a few pieces of molding, without using the customary glazing compound to seal it in.

One week after the break-in a well meaning neighbor saw a flickering light in the Law's otherwise darkened house and became suspicious. Aware of the previous burglary, he reported to the police that some one was breaking into the Law's home. Although the hour was 8:00 p.m., Mr. Law and his bride had retired for the evening. When the police arrived, a fuse of circumstances ignited by fear exploded into a tragedy of errors.

The police did not report to or question the calling neighbor. Instead they went about routinely checking the house seeking the possible illegal point of entry. They raised storm windows where they could reach them and shook the inside windows to see if they were locked. They shined flashlights upon the windows out of reach, still seeking evidence of unlawful entry. Finding none, two officers

entered the back screened porch to check the back door, whereupon they saw the windowpane which appeared to have been temporarily put in place with a few pieces of molding. These officers apparently had not known of the repair or the cause of damage.

Upstairs Mr. and Mrs. Law heard what sounded like attempts to enter their home. Keenly aware of the recent occurrence, Mr. Law went downstairs, obtained and loaded his newly acquired shotgun and, apparently facing the rear door of the house, listened for more sounds.

In the meantime, the uniformed officers found what they thought to be the point of entry of a burglar, and were examining the recently replaced glass. While Officer Adams held the flashlight on the recently replaced pane of glass, Officer Garrison removed the molding and the glass, laid them down and stated that he was going to reach in and unlock the door from the inside to see if entry could be gained. Officer Adams testified that they "were talking in a tone a little lower than normal at this point." Officer Adams stated that Officer Garrison then tested the inside lock, discovered it was a deadlock and decided no one could have gotten in the door without a key. A law enforcement student, riding with Officer Garrison that evening, testified that he then heard a rattling noise and someone saying "if there was somebody here, he's still in there." As Officer Garrison removed his hand from the window he was hit by a shotgun blast which Law fired through the door. Officer Garrison was dead on arrival at the hospital.

Officer Potts, the officer next to arrive at the scene, saw Officer Adams running to his car to call for reinforcements. He heard another shot and Officer Adams yell "they just shot at me."

The tragedy of errors had only begun. The officers, having obtained reinforcements and apparently believing they had cornered a burglar, subjected the house to a fusillade of gun fire evinced by over forty bullet holes in the bottom of the kitchen door and the police department transcription of a telephone conversation during the ensuing period of incomprehensible terror.

Mr. Law testified that while he stood listening to the sounds and voices at the door, fearful that someone was about to come in " . . . the gun went off, like that, and when it went off like that it scared me and I was so scared because I had never shot a shotgun before and then I heard a voice on the outside say that someone had been shot." Mr. Law was not able to hear who had been shot but he then " . . . hollered up to my wife, call a police officer, I think I shot a burglar." His wife called the police and most of her conversation was recorded. It is the most accurate portrayal of that which transpired and is repeated in *totidem verbis*:

"The portion of the transcription that follows involves the conversation between a female physically located within the crime scene, 6519 Medwick Road and LT SELLNER who was located in the Communications Division.

S - LT SELLNER     V - MRS. LAW     MALE VOICE - MR. LAW

S - Is he still downstairs?

V - I beg your pardon.

S - Hello, is he still downstairs?

V - Who is this speaking?

S - Are they still shooting?

V - Hello, hello. They're shooting in my house at my husband.

S - It's your husband?

V - They're shooting at him. Tell them to stop.

S - Alright where is he? Downstairs?

V - Tell them to stop shooting.

S - Alright, just hang on a minute. Hang on a minute. (Sounds of sporadic gunfire)

Male Voice - Hey police, hey police. Hey stop shooten, please. Stop shooten

S - Hello lady, MRS. LAW, MRS. LAW

V - Please tell them to stop shooting.

S - Alright, tell him to put his hands up over his head and come out the front door.

V - They keep shooting.

S - Tell him to put his hands up over his head and stop his shooting.

V - He's not shooting. They are shooting at him.

S - Alright, he's not shooting anymore?

Male Voice - Hey police, police, are you the police or not.

S - Alright, just hang loose a minute. Hang on there now.

Male Voice - Hey police, I'm coming out now. You hear me. Hey police you hear me. I'm coming out now.

V - OK

S - Hang on a minute.

Male - I'm coming out now. Can't you hear me? Hey police, don't you hear me?

GUNFIRE

S - Hey lady, MRS. LAW. Alright, MRS. LAW, we're going to stop the shooting over there. Tell the man, your husband, to put his hands up over his head and go out the front door.

V - Put your hands up over your head and go out the front door (Screaming) He's got to unlock the door, he's coming out. Please don't shoot him.

S - Alright, tell him to put his hands up over his head.

V - Hey, James, put your hands up over your head. OK, he's going to unlock the door, the front door was locked.

S - OK, Steve, tell them he's going to come out

the front door. Alright, he opened the front door, lady?

V - Just a minute, we're trying to find the keys. (Screaming — James look in my pocketbook. James look in my pocketbook for the keys and open the front door)

V - Please don't let them shoot him.

S - Alright, tell him to just unlock the front door and they've stopped the shooting now, haven't they?

V - Yes — unk-hah

V - Screaming — James look in my pocketbook and get the keys to the front door.

S - Alright, you got the front door open?

V - He hasn't got it open yet. He's trying to find the key.

S - Is anybody in the house other than your husband?

V - I don't know, sir. I'm still upstairs. Hey James, look in my pocketbook. Officer, please.

S - Alright just tell him to do what I tell him to do. Put his hands up over his head and go out that front door. Is your husband the one who called the police or was he the one who broke in or what?

V - James, put your hands up over your head and go out the front door.

S - Has he gone outside, ma'am?

V - No, he's still trying to get the keys. Please don't let them shoot him. He didn't bother nobody.

S - Alright just take and hold on there a minute. Then the cars outside have stopped shooting, right?

Male Voice - They're not police.

V - He says you're not the police. Are you a police?

S - Yes

V - He said they're not.

S - Who's not the police? Have you got the front door open?

V - Are you sure you're the police?

S - Has he got the front door open yet?

V - They're breaking in.

S - They're breaking in? Has he gone over to the front door yet? Hey, they're breaking in the door over there.

MALE VOICE - Hey police, police please don't kill me.

MALE VOICE - I don't know if you're the police.

S - Hello

S - MRS. LAW, MRS. LAW, MRS. LAW, Hello

MALE VOICE IN THE BACKGROUND - Yelling at the police

V - Hello, he's not armed.

S - Hello, MRS. LAW, has he got out the front door yet?

V - Just a minute. James go out the front door so nobody will hurt you.

MALE - How can I go out the front door when I can't find the keys?

V - The front door is locked and he can't find the keys.

S - Alright, wait a minute. Can he go out the back door?

V - Just a minute. Can you go out the back door, James?

MALE - I support the police

S - MRS. LAW, can he get out the back door? Alright, tell him to go out the back door.

V - James, he says go to the back door.

S - Alright he's going to go out the back door. He can't go out the front door because the front door is locked.

V - Don't fire.

S - He's coming out the back door. Alright, tell him to put his hands over his head and come to the back door. Come out the back door. Alright, he's going to put his hands over his head and come out the back door.

V - James, go out the back door.

S - Alright, are you coming out now? Alright, tell him to open the door and put his hands over his head. If he can't get out the front door, tell him to go out the back door.

V - The back door is locked also. Sir, we're not trying to harm anybody.

S - You don't have a key to either door?

V - Hold on James, they're the police so open the door.

MALE - I'm coming out, I'm coming out. You police hold your fire.

S - Did he get the door open?

V - James go on out.

MALE - You're not the police.

V - They are the police, honey, they are (HEAVY GUNFIRE)

V - Officer, officer, they're shooting at him again

S - Hey, they're shooting out there again.

S - Alright just hold on there.

MALE - Screaming very loudly, "They're not the

police, they're not the police" They shot me in my own house. They're not the police.

V - Officer, officer, please, officer, officer, officer!

S - Hello MRS. LAW. Has he gone out the back door yet?

V - Yes, officer, please come here in person.

S - Alright hang on a minute.

THE MAN, APPARENTLY UPSTAIRS NOW, SCREAMING UNINTELLIGIBLY: THE WOMAN, "JAMES GO DOWNSTAIRS, HONEY, THEY ARE THE POLICE" THE MAN YELLING

S - Alright, will you wait a minute?

MALE - Hey officer, they come in my house and shoot at her and shot me. They're shooting at me. I threw my gun out the window and they shot. They shot me for no reason.

S - Alright, will you go out the door with your hands over your head?

MALE - YELLING

S - Will you go out the front door with your hands over your head?

S - Hello, MRS. LAW, MRS. LAW, that man is still shooting out the window.

V - No my husband is not shooting, honestly.

S - Alright, tell him to go out front with his hands over his head. Tell him to throw his gun out the house.

V - James throw the gun out.

S - Hello, yes MRS. LAW, MRS. LAW tell him to throw his gun out of the house.

V - I told him to throw it out.

S - Tell him to go to the front door and put his

hands over his head and walk outside that house.

V - He's downstairs officer.

A - Alright, holler down to him and tell him to put his hands over his head and walk outside that house.

V - He's downstairs officer.

S - Alright, holler down to him and tell him to put his hands over his head and go out the front door. He can open it. He can open it. A while ago he opened it up and went outside and fired some shots. MRS. LAW, tell him to open the front door and go outside. MRS. LAW, is he going outside?

S - Hello, MRS. LAW, MRS. LAW. Hello.

V - Officer

S - Yes, MRS. LAW.

V - I hear a lot of walking all over the house.

S - I can't hear you

V - Are they in my house?

S - I don't know ma'am, I'm not there. Did he go out the front door, Hello. MRS. LAW

V - Officer, I believe they're in the house

S - What ma'am.

V - I think they're in the house.

S - You think the police are in the house.

V - Would you tell somebody that I'm upstairs.

S - Alright, Steve, tell the cars that there is a lady upstairs. MRS. LAW is upstairs. Okay, look why don't you holler down to them and tell them you are up there.

V - Would you please tell them

S - Yes, we are telling them on the radio. But they don't have too many radios with them.

24

V - I don't think anybody that has ever heard about or knows my husband been hit oh, officer, please.

V - Officer . . . .

S - Alright, alright. You've been doing real good thru this lady just hang on a while longer.

V - A littler while longer.

S - Alright tell them someone is upstairs. His wife is upstairs. She's on the phone to me. Alright MRS. LAW you still there.

V - Yes.

S - Okay just stay right there. They'll be coming up in a minute. Why don't you open the door and holler down to them.

V - Officer, officer, He told me to come down.

S - Alright put your hands over top of your head now Ma'am and go down the steps. Alright!

V - Okay.

S - Bye now.

V - I'm upstairs officer. Officer alright I'm coming. Officer, Officer, Officer.

S - They're inside. Troops inside.

S - Hello, hello, hello (background noise LONG DISTANCE OPERATOR: Hello

S - Hello

LONG DISTANCE OPERATOR - This is the long distance operator

S - Yes

LDO - Is this call finished

S - No, it is still in use.

LDO - Okay Sir.

S - Okay (more background noise)

Male voices - not legible

S - Hello, hello, hello, hello, hello (Male voices) Hello, hello, hello,

END OF TAPE"

The appellant, James Cecil Law, Jr. was found guilty of murder in the second degree and of assault with intent to murder. He was convicted by a jury in the Circuit Court for Charles County following removal from Prince George's County. Judge James C. Mitchell sentenced him to concurrent ten year terms.

\* \* \*

Appellant raises five questions each of which he assigns as error prejudicing the conduct of his trial.

\* \* \*

I.

"Was it error to deny Appellant's Motion for Acquittal at his trial?"

The appellant's first question assigning error for failure to grant his motion for judgment of acquittal is a request for our review of the trial court's constitutional responsibility to pass upon the sufficiency of the evidence. In doing so we are not permitted to substitute our judgment of whether there was reasonable doubt of the defendant's guilt for that exercised by the jury. The limit of our review is to determine whether there was relevant and legally sufficient evidence, properly before the jury, to sustain a conviction. *State v. Devers and Webster*, 260 Md. 360, 371.

The necessity of responding to this question is diminished by the result we reach here; however, appellant's assertion of the defense of habitation requires that we do more than summarily declare the question moot.

There is a dearth of Maryland authority upon the question of what constitutes justifiable homicide in the defense of one's home. We hasten to note, however, that the single case directly meeting the question does so concisely and clearly. In 1962, the Court of Appeals in *Crawford v. State*, 231 Md. 354, reversed a conviction of manslaughter against a 42 year

old man, suffering from a nervous condition and ulcers, whose home was being broken into by a 23 year old man and a partner. The decedent had knocked out a piece of masonite replacing one of four glass panes in the door. Crawford fired a shotgun through the door killing the attacker before he was able to enter.

Certain of the circumstances of that case coincide remarkably with the case at bar. It is as remarkably distinguished, however, by the character and purpose of the decedent, who had previously beaten Crawford and was returning to rob and beat him again after threatening to do so. Without digression on tangential issues, Chief Judge Brune noted with little discussion, as we do here, the appropriateness of the holding of *Gunther v. State*, 228 Md. 404, 409, that one not seeking a fight may arm himself in anticipation of a violent attack.

The defense of habitation is explained by text writers and treated in *Crawford* as an extension of the right of self-defense. The distinction between the defense of home and the defense of person is primarily that in the former there is no duty to retreat. *DeVaughn v. State*, 232 Md. 447. "A man in his own home was treated as 'at the wall' and could not, by another's assault, be put under any duty to flee therefrom." *Commonwealth v. Fraser*, 369 Pa. 273, 278, 85 A. 2d 126.

The regal aphorism that a man's home is his castle [1] has obscured the limitations on the right to preserve one's home as a sanctuary from fear of force or violence.

*Crawford* articulates the rule well, distilling it from a review of cases in many jurisdictions:

> "Most American jurisdictions in which the question has been decided have taken the view that if an assault on a dwelling and an attempted forcible entry are made under circumstances which would

---

1. It was said in Semayne's Case, 5 Coke 91a, 91b, 77 Engl. Rep. 194, 195, quoted in Perkins, *Criminal Law* (2nd ed), at 1022, that " . . . the house of everyone is to him as his castle and fortress, as well for his defense against injury and violence as for his repose . . . ."

create *a reasonable apprehension* that it is the design of the assailant *to commit a felony* or to inflict on the inhabitants injury which may result in loss of life or great bodily harm, and that the danger that the design will be carried into effect is imminent, a lawful occupant of the dwelling may prevent the entry even by the taking of the intruder's life." [2] (Emphasis partially added.)

The felonies the prevention of which justifies the taking of a life "are such and only such as are committed by forcible means, violence, and surprise such as murder, robbery, burglary, rape or arson." 1 *Wharton's Criminal Law and Procedure* (Anderson Ed.), § 206, at 454. Wharton goes on to say that it is "essential that killing is *necessary* to prevent the commission of the felony in question. If other methods would prevent its commission, a homicide is not justified; all other means of preventing the crime must first be exhausted." *Id.*, 455.

The right thus rests upon real or apparent necessity. It is this need for caution in exercising the right that has been relegated to obscurity. The position espoused by appellant typifies the misunderstanding of the extent of the right to defend one's home against intrusion. He says:

"The defendant is not required to act as a reasonable, prudent and cautious individual, nor was he required to limit his force to only that that was required under the circumstances — not when

---

**2.** Chief Judge Brune cites the following authority for this statement:

"1 *Warren on Homicide*, Sec. 162, pp. 805-6, citing authority from twenty-two American jurisdictions; Annotation, 25 A.L.R. 508, 509, citing authority from thirteen American jurisdictions; *People v. Osborne*, 278 Ill. 104, 115 N. E. 890 (rule stated, but not found applicable); *Carroll v. State*, 23 Ala. 28, 36 (rule stated, but not found applicable); *Parrish v. Commonwealth*, 81 Va. 1; *People v. Tomlins*, 213 N. Y. 240, 107 N. E. 496; and *Pond v. People*, 8 Mich. 150, a leading case in which the court said that a man assaulted in his dwelling 'may use such means as are absolutely necessary to repel the assailant from his house, or *to prevent his forcible entry,* even to the taking of life.' (Emphasis added.) See also *Beard v. United States*, 158 U. S. 550, 559; *Alberty v. United States*, 162 U. S. 499."

the defendant was in his own home, and believed he was being set upon, or about to be set upon by would be robbers or burglars who were in the act of breaking into his home at the time."

The judgment which must usually be made precipitously under frightening conditions nevertheless demands a certain presence of mind and reasonableness of judgment. Although one is "not obliged to retreat ... but ... may even pursue the assailant until he finds himself or his property out of danger ... , this will not justify a person['s] firing upon everyone who forceably enters his house, even at night." Harris, *Principles of Criminal Law* (adapted by M.F. Force), at 127. Hockheimer emphasizes that the taking of life is not justified "unless unavoidable .... Beyond this the law does not authorize the sacrifice of human life or the infliction of serious bodily hurt." *The Law of Crimes and Criminal Procedure* (2nd Ed.) § 345.

In 1894 Mr. Justice Harlan redefined the scope of the rule within its permissible limits:

"In East's Pleas of the Crown, the author, considering what sort of an attack it was lawful and justifiable to resist, even by the death of the assailant, says: 'A man may repel force by force, in defense of his person, habitation, or property, against one who manifestly intends and endeavors, *by violence or surprise,* to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is not obliged *to retreat,* but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing it is called justifiable self-defense; as, on the other hand, the killing by such felon of any person so lawfully defending himself will be murder. But *a bare fear of any of these offenses, however well grounded,* as that another lies in wait to take away the party's life, *unaccompanied with any overt act indicative of such an intention, will not warrant in killing that other by way of*

*prevention . . . .' " Beard v. United States,* 158 U. S.
550, 563. (Emphasis partially supplied.)

## II.

"Did the trial judge err in shifting the burden of
proof to the Appellant? "

Appellant points to a portion of the court's instructions
which he feels indicates an erroneous shifting of the burden
of proof. He contends this is tantamount to removing the
presumptive cloak of innocence constitutionally enveloping a
defendant. The judge issued a variant of the stock
instruction that once an illegal homicide is established the
law presumes it to be murder in the second degree. He then
went on to say that:

> "*the burden rests upon the accused as part of his
> defense to prove by a fair preponderance of the
> evidence* circumstances of a deviation or mitigation,
> which would lower, reduce the crime to
> manslaughter or he may show, by way of defense,
> that the killing was justifiable or excusable and
> that therefore he should not be held criminally
> accountable for any crime and the State has the
> burden of proving not by merely a preponderance of
> the greater weight of the evidence, but proving
> beyond a reasonable doubt the element which will
> raise the crime from second degree murder to first
> degree." (Emphasis supplied by appellant.)

We are unable to see how the "trial judge illegally shifted
the burden of proof to the defendant." Appellant points to
cases that draw semantic distinctions between the shifting
of the burden of proof and the burden of going forward with
the evidence. Undoubtedly the judge chose to avoid
confusing the jury with the fine academic distinctions of
shifting burdens. His choice of words was not such as appear
misleading or prejudicial. This court has itself used that
very expression. "The burden is on the defendant to prove by
a preponderance of the evidence that he acted in
self-defense. *Long v. State,* 3 Md. App. 638, 642 . . .; *Morris v.*

*State*, 4 Md. App. 328, 331 . . . ." *Chandler v. State*, 7 Md. App. 646, 651.

Any possibility of a misunderstanding was averted by emphatically placing upon the State the burden of proving guilt beyond a reasonable doubt. The judge elaborated upon that instruction as well as the presumption of innocence favoring the accused. We met this precise question in *Wilkins v. State*, 16 Md. App. 587. Judge Scanlan treats the issue at some length at pages 607 through 610. That discussion is dispositive of the matter here raised. We note further that seeing no "plain error" we are precluded from determining the issue since appellant did not object as directed by Md. Rule 756 f.

The dilemma of a trial judge dealing with this question is to determine at what point the niceties of law become confusing rather than enlightening. The "burden" is really one of overcoming a presumption of "malice" which does not arise until the state proves an "illegal homicide" committed by a defendant. Cf., *Davis v. State*, 204 Md. 44, 52.

The burden of overcoming the presumption by way of excuse, justification or mitigation has as a prerequisite that defendant did kill; he cannot excuse, justify or mitigate what he did not do. Only when that is established, can it be shown that the act was either excusable or justified.[3]

However, the phrase "burden to prove" connotes an affirmative burden on the part of a defendant and this may only be partially correct. A defendant obviously has the advantage of all circumstances of mitigation introduced by the State as well as by himself. It is conceivable that the state's evidence may prove an intentional homicide but also

---

**3.** "Justifiable" homicide is an act which the law *positively* enjoins upon the perpetrator or *positively* permits him to perform, *e.g.*, a capital crime execution or the prevention of a crime or an escape by a proper officer. "Excusable" homicide is expressed in a *negative* sense, in that the perpetrator acts in a manner which the law does not prohibit, *e.g.*, self defense or accidental homicide. *See* Harris, Principles of Common Law (adapted by M.F. Force), at 125. Harris finds the defense of one's habitation to be "very near the line which separates justifiable from excusable homicide; in fact it is difficult to distinguish between this and excusable homicide *Se defendando*. It may be questionable whether the distinction between justifiable and excusable is a substantial one; whether the cases under the former are not extreme cases of *Se defendando*." Id., p. 127.

totally disprove malice before the defendant is even called
upon to defend. While the evidence may fall short of that
sufficient to preclude the jury from finding malice, there
might be ample evidence from which they could find excuse,
justification or mitigation obviating a malicious intent, even
if the defendant chose to close without affirmatively
introducing any evidence.

### III.

"Did the trial judge err in instructing the jury that
the defense of justifiable homicide was available
only if the Appellant acted as a reasonable, prudent
and cautious man under the circumstances, and
that he used no more force than was necessary
under the circumstances? "

The same authorities answer appellant's third assignment
of error that answered his first. Appellant argues that in
defense of his home he "is not subject to the standards of a
reasonable, prudent and cautious person, nor is his degree of
force limited only to that required under the circumstances
to repel the intruder." Quite the contrary, we do not find the
right to defend one's habitation to be so absolute as to
sanction promiscuous shooting upon a baseless apprehension
by an unreasonable person. The permissible degree of force
used to repel an intruder must not be excessive. Wharton,
*supra*, emphasizes that "all other means of preventing the
crime must first be exhausted." The question of excessive
force to resist the intrusion, in most instances, as in
*Crawford, supra*, is the most difficult problem the jury has
to cope with when death of the intruder was the result.
Apropos of the appellant's question is the statement in *State
v. Sorrentino*, 31 Wyo. 129, 224 P. 420, 423, that a defendant
is not justified in taking a life " [i]f a cautious and pru-
dent man, under the same circumstances, would not believe
the danger to have been real. . . ." [4]

---

**4.** Equally apropos are the circumstances in Sorrentino which created
the reasonable belief of danger:

"The effect upon the human mind of darkness in the stillness of night is a
factor well known . . . A sudden appearance from out the darkness is apt to

## IV.

"Did the trial judge err in refusing to require the prosecutor to specify which assault with intent to murder Officer Adams the State was pressing? "

The evidence indicated that Officer Adams was standing outside appellant's rear door when appellant fired the shot which killed Officer Garrison. At least one other shot was fired from an upstairs window within a minute thereafter. Officer Adams testified that he thought it was directed at him as he was running along side appellant's house. The court instructed the jury that to convict appellant of assault with intent to murder it would have to find that "if Officer Adams had been struck *by either shot* and had died as a result of that, that the crime would be murder."

Appellant argues that the court should have forced the prosecutor to elect which assault he wished to proceed on. Appellant contends that the court's failure to do so permitted a less than unanimous jury verdict. He reasons that six jurors might find that one shot constituted assault with intent to murder but not the other, and the other six jurors reach the opposite conclusion. However, each group could return a guilty verdict and appear unanimous. His argument is ingenious, if not persuasive.

The appellant has no right to require the prosecution to choose which shot it will contend constituted an assault. However, the appellant might properly have requested an instruction that the jury must agree unanimously that one or both shots evinced appellant's intent to murder Officer Adams. Appellant did not object to the court's instruction as required under Md. Rule 756 f. We are consequently precluded from considering the question since we do not believe that the court's instruction constituted plain error. Md. Rule 756 g.

---

give at least a temporary nervous shock to the stoutest heart. Much more is that apt to be true when, roused from rest or slumber, on a dark night, footsteps and other sounds are heard which are calculated, as in this case, of giving the impression of boding no good." Sorrentino, *supra,* 424.

## V.

"Was the introduction of Appellant's extra-judicial statements unconstitutional and did it deprive him of due process of law and assistance of counsel? "

Out of the hearing of the jury the prosecutor submitted testimony "of two types of statements [of appellant] that the State would proffer. Generally speaking, they are exculpatory in nature." [5] The prosecutor indicated that one statement was "blurted out without custodial interrogation" while appellant was "in transport in an ambulance to Prince George's General Hospital . . . . The second statement would be a custodial statement . . . . once again exculpatory to the effect that he did admit to shooting the weapon in question. However, the other statements involved are generally speaking consistent with the theory of defense of Mr. Law . . . ."

After a hearing out of the presence of the jury, the judge concluded that the statements survived the *Miranda* test and admitted them. Although more factual recitations may become tedious, "An understanding of the nature and setting of this in-custody interrogation is essential to our decisions . . . ." *Miranda v. Arizona*, 384 U. S. 436, 445.

### The Spontaneous Statement

Upon apprehension appellant was found to have been injured, in part by the gunfire. His left hand, the back of his head and his eye were bleeding. He was transported to the hospital lying on his back with his hands handcuffed under him.

The officer guarding him in transit testified that Mr. Law was excited, hostile and upset. He did not, he testified, ask his prisoner any questions. Law did, however, blurt out "What is that white m . . . . . f . . . . . doing at my door and what are those honkeys doing in my back yard." The officer

---

5. For purposes of admissibility " . . . no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution." Miranda v. Arizona, 384 U. S. 436, 477.

testified that he then advised Law "Whatever you say may be used against you." "Shut up," he said he explained.

The fact that a statement is made in police custody does not alone render it involuntary. *Miranda v. Arizona, supra,* 462. We are persuaded that the court acted properly in finding that the statement was freely made and was not the product of any improper coercion or suggestion. Once the statement was admitted, the final determination of its voluntariness and the weight to be accorded it were matters for the jury. *Murphy v. State,* 8 Md. App. 430, 434.

## The Custodial Interrogation

Upon arrival at the hospital, Officers Jones and Potts were met by a uniformed officer assigned to the hospital. Within minutes Detective Hardester arrived. Detective Hardester, though assigned to the Juvenile Division, had monitored the police calls and volunteered his presence and his services. He was followed by Detectives Low and Porter. The six officers were all in the "seclusion room" with appellant. Detective Porter attempted to acquire a statement and Hardester "tri[ed] to find out from Mr. Law what had happened at his home . . . because I didn't know . . . ." The detectives were intermittently interrupted by the doctor or nurses either removing appellant for examination, x-ray or treatment. The officers were not permitted to follow appellant into the x-ray room.

In the presence of Detective Hardester, Officer Potts, Jones and Low and the uniformed officer assigned to the hospital, Detective Porter obtained an unsigned statement, the contents of which he testified to.

Detective Porter explained that he first read to appellant a "right's card" containing the essential requirements of *Miranda.* Then Detective Porter asked him if he was willing to make a statement without a lawyer present: "He said: 'I will tell you what happened.' But he said: I want to get treated." The taking of the statement was sporadic because the doctor would interrupt to treat the patient or Detective Porter would be called to the phone. During the first

installment Mr. Law told the officers about the burglary of his home and the police investigation.

Porter testified that Law then said that "he knew they were white, he says the Ku Klux Klan is out to get him . . . He said I could tell by their voices. And he used the phrase M.F." Officer Porter continued to recount his version of Law's statement:

"He said I took, I heard someone downstairs, I could hear their voices. I went and I got my gun from under the couch, I went down and I shot the white M.F. and I yelled to my wife upstairs to call the police, which she did.

"At this time there was a problem between myself and Mr. Law understanding was the police called first or was the police called after he fired the shot.

"He stated that he would like to be treated. Everytime a doctor would come in, I would leave the room but we always kept a uniformed officer on guard of him. He was then taken into x-ray. He was in x-ray approximately fifteen minutes. He was brought back to the isolation room, I continued the interview.

"It was approximately how much time elapsed before the reading of the x-ray come back, I couldn't tell you. I finished my interview. At this time they were getting ready to take him to the suture to sew up his head wounds, which he had in the back of his head.

"I then asked him would he mind signing the statement. He stated:

"I am not signing anything. And I want to be treated.

"At this time he was taken to the suture room, he was treated. From there he was taken upstairs where a sheriff was put on to guard him.

"Q Is it my understanding, Detective Porter, he indicated to you that after he fired the shots, he told his wife to call the police?

"A Yes, sir."

Detective Porter indicated that at "Different points in the statement he would say: I don't want to talk anymore. Finally at the end he said: I am not going to say any more until I am treated." Such was the substance of the statement made to Detective Porter and reduced to a written memorandum by him at the time.

During the entire interrogation at least one of appellant's hands was handcuffed to the side of the bed rail and he had restraining straps " . . . on his feet, on his legs." Detectives Porter and Low arrived a little before 10:00 p.m. and appellant was interrogated off and on until close to midnight. The hospital record reflected that at 10:05 p.m. he was administered 100 c.c. of demoral by intramuscular injection. While the record reflects nothing of the propensities of that application appellant stated that it made him very sleepy.

The interrogation had not ended. At the end of his statement to Detective Porter Mr. Law stated that he "didn't want to talk any more until he was further treated," whereupon Detectives Low and Porter left the room. At this time Detective Hardester "started to talk to Mr. Law . . . to find out if he would tell me what happened and answer some conversation." What Detective Hardester alleged ensued was the most significant, if not the most damaging, testimony presented.

The mandates of *Miranda* have been so often reiterated that they have become cliches and the original defendant's name a courthouse — if not a household — word. We will not review the admonitions prescribed; however, one slightly less hackneyed holding was manifestly breached. How it was breached is succinctly described by the testimony of Detective Hardester.

> "*He ended his statement with Detective Porter, telling him he didn't want to talk any more until he was further treated.*
>
> "Detective Porter left the seclusion room. Officer Low left the seclusion room, left myself and Officer Jones in the seclusion room.
>
> "At that time I started to talk to Mr. Law to find

out if he would tell me what happened and answer some conversation. I asked Mr. Law if he knew he had shot a policeman at the house and he stated that he knew he had shot a policeman, he thought the policeman was breaking into his home. He stated at first that he had thought the policeman was making an area check of his home because earlier that week someone had broken into his home and he filed a report with the police department and Detective Marcellino had been in contact with him. . . ." (Emphasis supplied.)

*Miranda v. Arizona, supra,* at 473-74, states:

> "*If the individual indicates in any manner, at anytime prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Emphasis added.)

In the light of this unequivocal directive, it should be unnecessary to state the obvious. Officer Hardester's continuing to take a statement from appellant after appellant told him " . . . he didn't want to talk any more . . ." was a denial of appellant's Fifth Amendment rights.

Moreover, the facts in this case lead us to wonder whether the statements elicited from the appellant at the hospital might not be deemed involuntary even under the pre-*Miranda* rule as being products of "a totality of circumstances evidencing an involuntary . . . admission of guilt." *Haynes v. Washington,* 373 U. S. 503, 514; see *Miranda v. Arizona, supra,* 739 (dissenting opinion of Clark, J). The numerous deviations from *Miranda* perfection which

appear in the record before us tip the scales dangerously near a deprivation of due process in the "totality of circumstances." The record reveals that:

> Appellant was in apparent, if not obvious, pain from his wounds, repeatedly requesting medical treatment.
>
> Appellant was placed in a "seclusion room" surrounded by 5 (and sometimes 6) officers in an alien atmosphere.
>
> Appellant was restrained in a mobile bed by straps and handcuffs.
>
> The questioning was conducted sporadically between operative procedures performed outside the realm of knowledge of the officers.
>
> Appellant stated at "different points" that he didn't want to talk any more; however, Detective Porter as well as Detective Hardester continued to interrogate him.
>
> Appellant was administered 100 c.c.'s of demoral to alleviate his pain.
>
> Appellant expressed considerable anxiety over his wife's safety without knowledge of her whereabouts.

It scarcely need be said that a more prudent policy would dictate that the officers wait until appellant's gunshot wounds had been treated and the effects of the pain killer had subsided. The admirable quality of zealousness in law enforcement officers must be tempered to the strictures of *Miranda*, even amid the agony of the loss of a fellow officer.

## REMAND

The extra judicial statement admitted by the court in violation of the *Miranda* sanctions had a bearing, not only on the murder conviction, but the assault with intent to murder as well. We reverse both convictions, therefore, and remand the matter for retrial.

*Judgments reversed; case remanded for a new trial.*